(106 So. 609)

**LANCASTER v. STATE.   (6 Div. 490.)**

(Court of Appeals of Alabama.   Feb. 17, 1925.   Rehearing Denied March 17, 1925. Cause Restored to Rehearing Docket June 30, 1925.   Rehearing Denied Oct. 27, 1925.)

**1. Homicide ☞104—Order of superior officer no protection to members of National Guard company engaged in a lynching.**

The order of a superior officer would be no protection to defendant, a sergeant in National Guard, nor to any one engaged in lynching prisoner.

**2. Conspiracy ☞45—In proof of conspiracy, any fact establishing agreement to carry into effect common purpose admissible.**

In proof of conspiracy, any fact or circumstance, either direct or circumstantial, tending to establish a concurring agreement to carry into effect a common purpose to commit the crime is relevant and admissible in evidence.

**3. Criminal law ☞423(8) — Conspirators bound by declarations of coconspirators in furtherance of common purpose.**

On formation of conspiracy, but not before, each conspirator is bound by acts and declarations of his coconspirators, done and said in furtherance of common purpose.

**4. Criminal law ☞423(5), 424(5)—Declarations made before or after conspiracy not admissible, unless part of res gestæ.**

Declarations by conspirators before formation of conspiracy, or after consummation of

---

its purpose, are not admissible against coconspirators, unless so closely allied with commission of crime as to become a part of res gestæ, in which event they are a part of a continuous transaction.

**5. Homicide ☞169(4), 234(5)—Defendant's being a member of National Guard company, stationed near place of crime, held relevant as preliminary proof of conspiracy by company, but not as establishing conspiracy.**

In prosecution for murder, fact that defendant and those with whom he is alleged to have conspired were in a National Guard company, stationed on strike duty near place where lynching was committed, was relevant as preliminary proof of conspiracy by company, but does not in itself establish conspiracy to commit the crime.

**6. Army and navy ☞36—Fact of defendant's being a soldier does not exempt him from crime or change rules of evidence.**

In prosecution for murder, alleged to have been committed in furtherance of a conspiracy by members of National Guard company, fact that defendant was a soldier in service of state cannot exempt him from crime or change rules of evidence applicable on a trial.

**7. Criminal law ☞423(3)—Act of conspirators in waking a coconspirator and telling him they were ready to go held admissible.**

In prosecution for murder by lynching, where evidence tended to prove a conspiracy between defendant and other members of a National Guard company to commit the crime, testimony by member of the company that on night of murder another member told him to "get up; the boys are ready to go," was admissible as coincident with and explanatory of a progressing transaction, under rule that all conspirators are bound by declarations and acts of coconspirators in furtherance of common purpose.

**8. Homicide ☞169(4)—Evidence of missing clothing of company conspiring to commit crime held inadmissible against a member of the company.**

In prosecution for murder, alleged to have been committed in furtherance of a conspiracy by defendant and other members of National Guard company, admission of testimony of assistant supply sergeant that, after crime, he found some of company's clothing and equipment to be missing, without evidence to identify the missing clothing or to connect defendant with its loss, was error as being a subsequent circumstance not obviously related to crime charged.

**9. Homicide ☞169(4)—Circumstantial evidence, to be admissible, must have some connection with inference or result designed to be established.**

In prosecution for murder growing out of conspiracy, circumstantial evidence, tending to connect defendant with crime, though of necessity taking a wide range, to be admissible, must have some natural, necessary, or logical connection with inference or result designed to be established.

**10. Criminal law ☞351(10)—Testimony that officer not connected with conspiracy sought to suppress testimony held not admissible.**

In prosecution for murder growing out of alleged conspiracy by defendant and other members of National Guard company, testimony that some time after crime, and while company was to be examined by Attorney General, the commanding officer of the company, who was not shown to have been connected with conspiracy, told the men not to say anything, did not call for a repudiation or denial by defendant, and hence, since made after the crime, its admission in evidence was error.

**11. Criminal law ☞407(2)—Statement calling for repudiation or denial to prevent its being used as an admission must have been acquiesced in by defendant.**

In order that a statement, made by party not connected with conspiracy to commit a crime, shall call for repudiation or denial by a conspirator to prevent its being taken as an admission against him, there must have been exhibited some act of mind such as to amount to voluntary demeanor or conduct on part of conspirator.

**12. Criminal law ☞407(2)—Evidence held insufficient to connect statement by defendant with statement of another seeking suppression of testimony so as to make it admissible.**

In prosecution for murder growing out of an alleged conspiracy by defendant and other members of National Guard company, evidence *held* insufficient to connect statement by defendant, made some time after crime, while company was to be examined by Attorney General, to the effect that any one squealing would be punished, with statement by commanding officer of company cautioning men not to say anything, or that defendant heard or understood officer's statement, and hence it w⁻s error to admit latter's statement against ( ndant.

**13. Criminal law ☞351(10)—Testimony that officer not connected with conspiracy instructed men not to say anything held erroneously admitted.**

In prosecution for murder growing out of alleged conspiracy by defendant and other members of National Guard company, admission of evidence that commanding officer of company, while on train carrying company to be examined by Attorney General as regards crime, instructed men not to say anything was error; there being no pretense that defendant adopted or acquiesced in officer's statement.

**14. Criminal law ☞351(10)—Statement of officer not connected with conspiracy, to men to make statement, and then say nothing more, held not to show effort to suppress testimony.**

In prosecution for murder growing out of alleged conspiracy by defendant and other members of National Guard company, testimony that, after crime had been committed, and while company was on its way to be examined by the Attorney General, the commanding officer of the company, not connected with the conspiracy, told men to go ahead and make their statement, and then say nothing more,

*held* not to show effort to suppress testimony, and hence its admission was error.

**15. Criminal law ☞459—Identification of Buick car by sound of its exhaust held permissible.**

Where an expert auto mechanic testified that he knew Buick car and peculiarity of the exhaust from its engine, his identification of a Buick car by sound of exhaust was permissible, under rule that identity may be formed by any of the senses of seeing, hearing, feeling, smelling, or tasting, if test is such as to impress the mind as to identity of thing testified about.

**16. Criminal law ☞361(1)—Testimony that car used by conspirators was found stuck in mud held competent in explanation of other evidence.**

In prosecution for murder growing out of an alleged conspiracy by defendant and other members of National Guard company, where evidence showed that part of mob rode to scene of crime in a Buick car, it was competent to show that car went to soldier camp and came out shortly afterwards, and was found stuck in mud near camp, as tending to explain why car was not in camp after serving purpose of the conspirators.

**17. Criminal law ☞363—Every happening to car used by conspirators until completion of purpose admissible, but not its subsequent removal.**

In prosecution for murder growing out of alleged conspiracy by defendant and other members of National Guard company, every happening to car used by conspirators in the crime from time it started on its death mission until conspirators had accomplished purpose and returned to their station was part of the res gestæ, what was done with the car thereafter being relevant only on question of identity of car, and hence fact that car was driven from camp and stuck in mud could not be admitted as an incriminatory act of defendant, unless he was connected with its removal.

**18. Criminal law ☞368(3)—Finding of apparel in death car not relevant as part of res gestæ.**

In prosecution for murder growing out of an alleged conspiracy by defendant and other members of National Guard company, testimony by passenger of death car that he found certain wearing apparel therein, and that he placed apparel in supply room, was not relevant as part of res gestæ, since apparel was in no way connected with defendant or with any parties said to have been in car.

**19. Criminal law ☞424(1)—Testimony as to finding of muddy clothing shown to be connected with conspirators held admissible.**

In prosecution for murder growing out of an alleged conspiracy by defendant and other members of National Guard company, testimony that, after murder, muddy clothing bearing marks indicating connection of members of company with conspiracy was found in ceiling of one of company's houses was properly admitted as authorizing jury to conclude that parties were still acting in unison in conceal-ing evidence tending to connect them with the crime.

**20. Criminal law ☞424(1) — Conspirators bound by acts of coconspirators in concealing evidence of crime.**

A concert of action by conspirators, after commission of the object of the conspiracy, to conceal evidence of the crime constitutes each the agent of the other as to bind each by acts or declarations connected with such concealment.

**21. Homicide ☞174(6)—Testimony by custodian of rifle that he missed it on night of homicide and saw it next morning in muddy condition held admissible.**

In prosecution for murder growing out of alleged conspiracy by defendant and other members of National Guard company, where defendant asked for loan of an automatic rifle, it is relevant for custodian of rifle to testify that on night of homicide he missed the rifle, and, on seeing it again the next morning, it had mud on it.

**22. Criminal law ☞438—Photographs of scene of homicide relevant, and may be used by witnesses.**

Photographs of scene of lynching are relevant in prosecution for homicide, and witnesses may refer to them in illustrating their testimony.

**23. Witnesses ☞374(1)—Testimony of winking by one of defendant's witnesses to influence another on stand held admissible.**

In prosecution for murder, testimony that defendant's witness winked at another witness, while latter was being examined by military board regarding the crime, in an effort to prevent latter from disclosing facts was admissible as tending to show interest by defendant's witness.

**24. Witnesses ☞328 — Question to defendant as to whether he knew and could name members of his National Guard company held proper.**

In prosecution for murder growing out of an alleged conspiracy by defendant and other members of National Guard company, it was permissible for state to ask defendant if he knew and could name members of his company at time of the crime as tending to test his knowledge and recollection.

**25. Criminal law ☞539(1)—Testimony of witness at previous trials held admissible, though contradictory.**

Where both state and defendant complied with rule permitting introduction of testimony at a former trial, fact that testimony of witness at second trial tended to impeach testimony at first trial would not render the evidence at either trial illegal.

**26. Witnesses ☞388(2)—In absence of proper predicate in statement of a witness, it cannot be impeached by proof of a different statement.**

Where a proper predicate has not been laid in a statement of a witness, statement cannot

---

☞For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

be impeached by proof of a different statement at another time and place.

**27. Criminal law ⊕⟳1169(1)—Any error committed in admitting testimony of previous trial not injurious, where not contradicted at present trial.**

If excerpts from testimony of defendant's witness taken at a previous trial did not contradict testimony at present trial, any error committed would not injuriously affect the defendant.

**28. Criminal law ⊕⟳1134(3)—Exceptions not likely to arise again or which are frivolous not considered.**

Exceptions in record which will not probably arise on another trial or which are frivolous and incidental will not be passed upon.

On Rehearing.

**29. Criminal law ⊕⟳1179—Supreme Court will revise appellate court only on questions of law.**

The Supreme Court will revise the rulings of the Court of Appeals on certiorari only as to questions of law, not upon findings of fact or application of facts to law.

Appeal from Circuit Court, Marion County; Charles P. Almon, Judge.

Robert Lancaster was convicted of murder in the second degree, and he appeals. Reversed and remanded.

Certiorari denied by Supreme Court in Ex parte State (Lancaster v. State), 214 Ala. 2, 106 So. 617, and Id., 214 Ala. 76, 106 So. 618.

A. H. Carmichael, of Tuscumbia, E. B. & K. V. Fite, of Hamilton, Foster, Rice & Foster and Harwood & McQueen, all of Tuscaloosa, and L. D. Gray, of Jasper, for appellant.

It was error to permit the witness Hartley to testify that Nolan woke him up in the supply room, and to testify what Nolan said to him. Phœnix Ins. Co. v. Moog, 78 Ala. 284, 56 Am. Rep. 31; Tittle v. State, 15 Ala. App. 306, 73 So. 142; King v. State, 15 Ala. App. 67, 72 So. 552. Defendant's objection to questions propounded to witness Hartley, with reference to alleged statements made by Capt. Lollar to the company, should have been sustained, and answers thereto should have been excluded. Phœnix Ins. Co. v. Moog, supra; Everage v. State, 113 Ala. 102, 21 So. 404; 1 Greenleaf on Evi. §§ 184a, 233; Delaney v. State, 204 Ala. 685, 87 So. 183. It was not permissible for the witness Avery to give his opinion as to the identity of an automobile, based simply upon the noise it made (Hodge v. State, 97 Ala. 37, 12 So. 164, 38 Am. St. Rep. 145; Busby v. State, 77 Ala. 66; Riley v. State, 88 Ala. 193, 7 So. 149; Dobbins v. State, 15 Ala. App. 166, 72 So. 692; Du Bose v. State, 148 Ala. 560, 42 So. 862), and to testify the direction taken by the car (Tittle v. State, supra; King v. State, supra; Everage

v. State, supra). Defendant's objection to evidence that the automobile was stuck in the mud should have been sustained. 1 Greenleaf on Evi. § 184a; authorities, ubi supra. Evidence that clothing was found in the car and around the camp was erroneously admitted; so as to the condition of said clothing and the introduction of same in evidence, and as to the rifle defendant sought to borrow. Authorities, supra. It was error to permit the introduction in evidence of photographs of the scene, and to permit evidence with reference thereto. K. C., M. & B. v. Smith, 90 Ala. 25, 8 So. 43, 24 Am. St. Rep. 753. A witness may not be impeached upon an immaterial matter. Steinhardt v. Bell, 80 Ala. 208; Griel Bros. v. Solomon, 82 Ala. 85, 2 So. 322, 60 Am. Rep. 733. Excerpts from the testimony of McBride, Moore, and Watkins on a former trial were erroneously admitted in evidence. Gafford v. State, 125 Ala. 1, 28 So. 406; Pruitt v. State, 92 Ala. 41, 9 So. 406; Gregory v. State, 140 Ala. 16, 37 So. 259. Declarations made after the commission of the crime are only admissible against the party making them. Martin v. State, 89 Ala. 115, 8 So. 23, 18 Am. St. Rep. 91; 1 Greenleaf on Evi. 371. Defendant not having been shown to have heard the statements of Lollar made on the train, or to have acquiesced therein, such statements were erroneously admitted as against the defendant. Delaney v. State, 204 Ala. 685, 87 So. 183; Martin v. State, supra.

Harwell G. Davis, Atty. Gen., Horace C. Wilkinson, Sp. Asst. Atty. Gen., and W. C. Davis, of Jasper, for the State.

There was no error in permitting the witness Hartley to testify that there was a shortage of equipment and clothing of the company when he checked up a day or two after the lynching. Jones on Evi. (Blue Book) §§ 137B. 173; Thomas v. State, 11 Ala. App. 85, 65 So. 863; Smith v. State, 133 Ala. 145, 31 So. 806, 91 Am. St. Rep. 21; Burton v. State, 115 Ala. 1, 22 So. 585; Stone v. Stevens, 12 Conn. 219, 30 Am. Dec. 611; Morrow v. State, 19 Ala. App. 212, 97 So. 106; Castle v. Bullard, 23 How. 172, 16 L. Ed. 424; 17 C. J. 240; Sorrell v. Scheuer, 209 Ala. 268, 96 So. 928; Clark v. U. S. (C. C. A.) 293 F. 301. It was not error to admit evidence with reference to the pair of pants and hat found in the car, and the disposition and later disappearance of these articles. Anderson v. State, 209 Ala. 36, 95 So. 171; Pope v. State, 168 Ala. 33, 53 So. 292. An attempt to suppress testimony may be given in evidence as tending to show guilt. Ex. parte State, 209 Ala. 5, 96 So. 605. Such an attempt on the part of a person other than the accused may be proved, if the accused had knowledge of or was in any way connected with the attempt. Wigmore on Evi. (2d Ed). 572; McAdory v. State, 62 Ala. 154; 16 C. J. 550; Clarke v. State, 78 Ala. 474, 56 Am.

⊕⟳For other cases see same topic and KEY-NUMBER in all Key-Numbered Digests and Indexes

Rep. 45; Morehead v. Comm., 194 Ky. 592, 240 S. W. 93. The conspiracy to commit the crime and the conspiracy to suppress evidence are distinct. The conspiracy to suppress was provable by circumstantial evidence. 5 R. C. L. 1088; Comm. v. Smith, 163 Mass. 411, 40 N. E. 189; 8 Cyc. 685; People v. Arnold, 46 Mich. 268, 9 N. W. 406; Jones on Evi. § 17; 2 Wharton's Cr. Law, 1823. The decision of the Supreme Court governs the Court of Appeals, and judicially forecloses further inquiry into the questions in the record. Lancaster v. State (6 Div. 420) 214 Ala. 2, 106 So. 617.

SAMFORD, J. The evidence in this case establishes the fact that a mob composed of several masked men forced its way into the jail of Walker county after 12 o'clock at night, overpowered the jailer, took from the jail Willie Baird, one of the prisoners, conveyed him by automobile to a lonely road, and there murdered him. The corpus delicti is therefore not involved in a consideration of this appeal.

[1] The murder occurred on the night of January 12, 1921, at a time when the miners of that section of the state were on a strike, and various companies of the National Guard, among which was Company M of Tuscaloosa, Ala., had been ordered by the Governor to duty in the strike region to preserve order and to protect life and property. The area patrolled by Company M was near Jasper in Walker county, and near the scene of the lynching, and it is claimed and charged by the state that the mob committing the crime was composed of members of Company M, some of whom were officers and some privates in the ranks; the defendant being a sergeant. It is not contended, however, that the murder was committed as a result of any military command given by a superior officer. The act clearly showing on its face its own illegality, and want of authority, the order of a superior officer would be of no protection to this defendant, nor to any one engaged in the commission of the crime. 27 Cyc. 507, art. 7.

Even, therefore, if the mob was composed of officers and members of Company M, each acted upon his own responsibility in the formation of the conspiracy and the carrying into effect the common purpose to murder, as if there had been no such organization as Company M; the fact of the existence and location of Company M being relevant in this case only as preliminary proof of the grouping of certain men, some of whom may have formed the mob which committed the crime.

[2] After proof of the corpus delicti, the state sought to prove a conspiracy. In making this proof, the evidence takes a wide range. Any fact or circumstance, either direct or circumstantial, tending to establish a concurring agreement to carry into effect a common purpose to commit the crime, is relevant and admissible in evidence. 5 R. C. L. 1088 (37). A motive, threats, assembling together at unusual times and places, declaration of purpose, acts in preparation, and, in fact, any act or words of the parties charged, though remote, tending to an understanding of a common purpose to carry out a common design, would be relevant and admissible.

[3, 4] If and when, but not before, the conspiracy is formed, each conspirator is bound by the acts and declarations of his coconspirators done and said in furtherance of the common purpose. Leverett v. State, 18 Ala. App. 578, 93 So. 347; Martin v. State, 89 Ala. 115, 8 So. 23, 18 Am. St. Rep. 91. But declarations made before the formation of the conspiracy or after the consummation of its purpose are not admissible, unless so closely allied with the commission of the crime as to become a part of the res gestæ, in which event they are a part of a continuous transaction. Leverett's Case, supra; Martin's Case, supra.; 5 R. C. L. 1089 (39).

[5, 6] The fact that this defendant and those with whom he is alleged to have conspired were in a company of soldiers comprising a part of the National Guard of the state, and stationed in strike duty near the place where this crime was committed, was relevant as preliminary proof. Such evidence could not and should not be taken as a fact in itself tending to establish the conspiracy. The voluntary service of the citizen soldier is the highest expression of patriotism—the sacrifice of private interest, of time and property, and even of life itself, to maintain the sovereignty of the state. Such service should not be rewarded by the application of a rule that would make the very act of service a circumstance against a defendant in establishing his guilt in the commission of a crime, even though that crime may have been committed by some of the individuals engaged in a similar service. On the other hand, the fact of his being a soldier in the service of the state cannot exempt him from crime or change rules of evidence applicable on a trial.

[7] The first insistence of error is that the court erred in permitting the witness Hartley to testify that on the night of the murder Frank Nolan, a member of the company, came to the supply room where witness was sleeping, woke witness up, and said: "Get up; the boys are ready to go," and witness replied: "I ain't going." Evidence has already been admitted tending to prove a conspiracy between defendant and other parties, including witness, to commit the crime charged, and, under the rule above stated that all of the conspirators are bound by the declarations and acts of coconspirators in furtherance of the common purpose, this declaration and act of Nolan was coincident with and explanatory of a progressing transaction in contradistinction from a narrative

only of a past transaction. 2 Wharton Ev. par. 1206. The foregoing rule taken from Wharton's evidence is cited and treated at length in Phœnix Ins. Co. v. Moog, 78 Ala. 284, at page 306, 56 Am. Rep. 31, and cited by appellant in his brief.

[8, 9] Further on in the examination of the witness Hartley, the assistant supply sergeant of Company M testified that he did not stay at the soldiers' barracks the remainder of the day after the discovery of the crime in the morning of Friday, but with Quin and Capt. Lollar went to Jasper to the headquarters of Col. Smith, who was in command of the regiment, and remained over night at headquarters. Afterwards witness went to Tuscaloosa with the company, leaving the company equipment at the camp, and afterwards he and Quin and Capt. Lollar came back through the country. The state was then permitted to prove, over the timely objection and exception of defendant, that witness then "checked up" the company's property, and that all the guns were there, but that: "We were short on clothing and equipment." There is no effort to identify what equipment or clothing were short, or how much or what kind, nor was there any evidence tending to connect this defendant with its loss or destruction. The evidence for the state was that the parties who took Baird from the jail were masked with flour sacks, and dressed in long black overcoats and miners' caps. The evidence tending to connect this defendant with the commission of the crime charged is largely circumstantial, and in such cases the testimony of necessity takes a wide range, but, even in this character of evidence, in each fact proven there must be some natural, necessary, or logical connection between them and the inference or result which they are designed to establish. 8 R. C. L. p. 180, par. 172. The rule as stated in Wharton, Crim. Ev. vol. 2, p. 1745, is, where subsequent circumstances are discounted from, and have no obvious relation to, the act charged, they are irrelevant and inadmissible. Whatever of the equipment and clothing of Company M was found to be short or missing, such missing equipment and clothing was not "obviously" related to the act charged in the indictment. The admission of this testimony was error.

[10] Some time after the crime charged had been committed, after Company M had been taken to Tuscaloosa, and then carried in a body under military discipline and in command of Capt. Lollar, the commanding officer of the company, to be examined by the Special Attorney General in Birmingham, the state was permitted to prove, over the objection and exception of defendant, that, while in Birmingham, and just before the members of the company were carried before the Special Attorney General to be examined touching their knowledge of the crime, Capt. Lollar, who was then in command of the company of which defendant was a member, and as such was present, said:

"They will put you in a room over there, and don't have anything to say. He cautioned us about this dictaphone, or whatever you call it, in the wall, and says: 'If you say anything they will get it on that, and they will have it just the same as if you were making a statement yourself; the biggest thing you can say is to say, "No, know nothing about it."'"

If these statements had been made by defendant, or if made in such manner or under such circumstances as that he would be bound by them, such evidence would have been relevant. Smith v. State, 16 Ala. App. 546, 79 So. 802. But these statements, if made, were made by a party not shown to have been one of the conspirators, and against whom there was no sufficient evidence to connect him with the conspiracy at a time and place after the crime had been consummated and under circumstances which did not call for repudiation by the defendant. Even if it be admitted that Capt. Lollar was one of the conspirators (and as to this there is no sufficient evidence in this record), the declaration admitted in evidence was after the common enterprise was at an end, and in such cases subsequent acts or declarations are only admissible as against the party making them, except in certain cases hereinabove treated. 1 Greenleaf, p. 371, par. 233; Martin v. State, 89 Ala. 115, 8 So. 23, 18 Am. St. Rep. 91.

[11] Was the statement of Capt. Lollar made to the company as a whole such as that it called for repudiation or denial by the defendant in order to prevent such statement being taken as an admission against him. In other words, did the defendant, with a knowledge of the fact that it had been made, acquiesce in the statement of Capt. Lollar? To have this effect there must have been exhibited some act of the mind such as to amount to voluntary demeanor or conduct on the part of defendant. Says Mr. Greenleaf:

"It must plainly appear that such conduct was fully known, or the language fully understood by the party before any inference can be drawn from his passive silence. The circumstances, too, must be only such as afforded him an opportunity to act or to speak, but such also as would properly and naturally call for some action or reply from men similarly situated." 1 Greenleaf, p. 330, par. 197.

Such was not the case here, and the court erred in the admission of the statements attributed to Capt. Lollar to the company in Birmingham.

[12] It is true the witness Hartley testified defendant was present at the camp or barracks in Birmingham, together with the company, or, to use his words:

"The whole company was present at the time he (Lollar) made the statement I refer to. We were all up in our apartment of the barracks. There were two or three companies there, the way I understand it, and we were all in our apartment. He told us all after we had made our statement not to say anything else; says, 'Go ahead and make your statement, and then don't talk any more.' That is all he told us."

Following the examination of Hartley on this point, he was asked the question:

"Did Lancaster have anything to say to you or anybody else in your presence or hearing regarding what would happen to the one that squealed or talked? Before the company was brought to my office in Birmingham for investigation did Lancaster say anything either to you or anybody else in your presence or hearing?"

Upon the witness answering "Yes," he was asked: "What did Lancaster say" to which was the reply: "If any of you jug heads go and squeal on us we're going to whip hell out of you." The question here is not the admission of the remark attributed to Lancaster, but the admissibility of the testimony as to statements alleged to have been made by Capt. Lollar in the barracks and to the company of which defendant was a member. The statement of defendant certainly does not of and in itself make it plainly appear that defendant had heard or understood what Capt. Lollar had said. There were three companies in the barracks (150 men) at the time, one of whom was defendant. There is no evidence placing defendant in such position at the time as that he should have heard and understood, and, although the defendant's remark follows in the record the testimony of Hartley as to what was said by Capt. Lollar, there is no indication that the remark was in recognition of, or in response to, what Lollar said, and, further, it does not appear whether defendant's alleged remark was made before or after the instructions of Lollar. It being the duty and province of this court to make findings of fact from the evidence in the record, we find, and so hold, that there is not sufficient evidence to connect the remark of the defendant, "If any of you jug heads squeal on us," etc., with the alleged instructions alleged to have been given by Lollar in the barracks in Birmingham, or that defendant heard and understood the Lollar instructions.

[13] In this connection our attention is called to another ruling of the court not referred to in the original opinion. On the train, while Company M was on its way to Birmingham to be examined, the company riding in one car, the witness Hartley was permitted to testify that Capt. Lollar gave the same instructions as to making statements as he did afterwards in the barracks; the only predicate for this testimony being that defendant, being a member of the company, was supposedly in the car with 50 men, while the train was running, and therefore heard and understood its import. There is no pretense that defendant adopted or acquiesced in the instructions. The stating of this proposition is its own obvious answer. Authorities supra. The admission of this evidence was error.

[14] We come now to a consideration of another phase of Hartley's testimony as to what Lollar said on the train while on the way to Birmingham and at the barracks just before the members of the company were carried before the Special Attorney General for examination. This testimony is claimed to be admissible, for that it shows an effort on the part of Lollar, and with a full understanding of its import participated in by defendant, to suppress evidence of the crime with which this defendant and others, but not Lollar, was afterwards charged by indictment. If Capt. Lollar's instructions could not fairly be construed as an effort to suppress testimony or to impede justice, then such testimony was not admissible for any purpose, and the testimony of Hartley as to this should have been excluded. Here, too, it becomes the duty of this court to make a finding as to the evidence. The entire testimony of Hartley as to what was said by Lollar is grounded in this sentence in the exact words of the witness:

"Capt. Lollar instructed me and the other members of the company not to have anything to say after we had made our statement."

Then, after being led through an examination regarding what was said by Lollar about making statements in a room where might be located a dictophone, this witness closed his testimony on cross-examination by saying:

"Capt. Lollar says: 'Go ahead and make your statement, and then don't talk any more.' That is all he told us, except he told us there might be a dictophone around there in the wall, and that might get what we said just the same as if we had made it before Judge Wilkinson."

This last remark evidently referring to a room in which the Special Attorney General was not present. This instruction in no sense implied, or would warrant the jury to infer, that Capt. Lollar was giving instructions to suppress testimony or to impede justice. In fact, his instructions were:

"Go ahead and make your statement, and then don't talk any more."

The testimony as to what was said by Capt. Lollar for this reason was illegal, and should have been excluded.

[15] State witness Avery, shown to have been an expert automobile mechanic and familiar with automobiles, was permitted to testify to the identity of a certain Buick car by the sound of the exhaust to its motor. This witness had testified that he knew the Buick car, knew the peculiarity of the ex-

haust from its engine, and then gave it as his best judgment that the car passing a certain point on the road was this car. This was permissible. Judgment as to identity may be formed through and by any of the senses of seeing, hearing, feeling, smelling, or tasting, if the test is such as to impress the mind as to the identity of the thing testified about.

[16, 17] It having been testified to that the mob who committed the crime charged in this indictment went to the jail in Jasper in a Buick car belonging to a man named West, and that the party who made up a part of the mob rode to the scene of the crime in the same car, it was relevant to follow this car and show what became of it after the crime had been committed. It was therefore competent to show that the car went to the soldier camp, and that it came out shortly afterwards, and was found stuck in the mud in the road near by the camp, as tending to explain why the car was not in the camp after having served the purpose of the conspirators. Everything happening to the car from the time it started on its death mission until the conspirators had accomplished the purpose of the mission and been returned to their station where they ceased to use it was a part of the res gestæ. What was done with the car after that time was relevant merely on the question of the identity of the car. The fact that the car was run away from the soldier camp and stuck in the mud could not be admitted as an incriminatory act of defendant, unless he was shown to have been connected with its removal. 1 Greenleaf, par. 184.

[18] It having been testified to that Clyde Springer was in the death car shortly after its arrival in the soldier camp, it was not relevant as part of the res gestæ for Springer to testify that he found in the car "a pair of pants and a hat." These articles of apparel were in no way connected with the defendant nor with any of the parties said to have been in the car. For aught that appears, these articles may have been put in the car after the defendant left it. It was not even shown by this witness that the pants and cap were of the uniform of the National Guard, or, in fact, in any way tended to connect defendant with the commission of the crime. It follows from the above that the fact that Springer took the pants and cap and laid them on a table in the supply room from which they disappeared was also irrelevant. So far as the court may know, the rightful owner may have removed them. Certain it is that no testimony is introduced tending to connect this defendant with the removal and destruction of the pants and cap.

[19, 20] The court, over the objection and exception of defendant, admitted testimony of the finding of certain articles of clothing, found on Sunday after the murder, hidden behind the ceiling in a closet of one of the houses used by Company M as a camphouse. The clothing found was muddy and wet, and had marks on each garment indicating a connection with one or all of the other men, members of Company M, as to whom there was testimony tending to connect them with the conspiracy, and an effort on the part of some one to conceal testimony. The finding of the clothing, as indicated by the evidence in this record, and under the facts stated by the witnesses, would, if connected, authorize the jury to conclude that the parties were still acting in unison in concealing evidence tending to connect them with the crime. This holding is not in conflict with the holding in the foregoing opinion that admissions made after the consummation of the purpose of a conspiracy are only binding on the party making them, but proceeds upon the rule that a concert of action by the conspirators, after the commission of the object of the conspiracy to conceal the evidence of the crime, constitutes each the agent of the other in such sort as to bind each by act or declarations connected with such concealment. 1 Greenleaf, Ev. par. 184. The destruction or concealment of pertinent evidence is always a prejudicial circumstance of great weight. 2 Wharton, Ev. par. 748. In connection with the marks of identification, the court did not err in its various rulings with respect to the clothing found.

[21] In connection with the other testimony to the effect that defendant had asked for the loan of an automatic rifle, it was relevant for the custodian of the rifle to testify that on the night of the homicide he missed the rifle, and when he saw it again next morning the rifle had mud on it. We think it unnecessary to detail all of the evidence connecting this fact.

[22] The photographs of the scene of the homicide were relevant, and witnesses were properly permitted to refer to them in illustrating their testimony.

[23] The testimony that defendant's witness Searcy was winking at defendant's witness Key, while Key was being examined by a military board touching his knowledge of this crime, in an effort to prevent Key from disclosing facts was admissible as tending to show an interest by Searcy in the defense of this case. Testimony of interest or bias on the part of a witness is always relevant.

[24] On cross-examination it was permissible for the state's counsel to ask defendant if he knew and could name the members of Company M at the time of the crime as tending to test his knowledge and recollection. It follows, of course, from what has been said with reference to the testimony of the witness Searcy, that the testimony of McMeans impeaching the statement on that point was relevant.

[25, 26] It was shown on the trial that

Lieut. McBryde, who had testified on two former trials, at which his testimony was reduced to writing, was dead. The defense thereupon introduced certain excerpts from his testimony on the second trial, and the state, over the objection of defendant, introduced certain excerpts from his testimony at the first trial. It is now contended that, because there was some contradiction in the two statements, the state should not be permitted to do this. It is true that, where a proper predicate has not been laid in a statement of a witness, the statement cannot be impeached by proof of a different statement at another time and place. Gafford v. State, 125 Ala. 1, 28 So. 406; Gregory v. State, 140 Ala. 16, 37 So. 259. But both the state and defendant had complied with the rule permitting them to introduce testimony taken at a former trial, and, if the one tended to impeach the other, that fact would not render the evidence illegal.

[27] If, as is contended by appellant, the excerpts from the testimony of defendant's witnesses Moore and Watkins, taken on previous trial of this case, did not contradict any of their testimony given on the present trial by these witnesses, then the error, if any, did not injuriously affect the defendant.

[28] There are numerous exceptions appearing in the record which we do not pass upon, for the reason that the questions will not probably arise on another trial, and there are many that are frivolous and incidental to the long and hotly contested criminal case, which need no consideration. It seems impossible to eliminate these from trials, but appellate courts cannot be expected to give close and critical consideration to each, lest the consideration of one record such as this would consume the entire term of the appellate court.

For the errors pointed out, the judgment is reversed and the cause is remanded.

Reversed and remanded.

RICE, J., not sitting.

### On Rehearing.

On February 17, 1925, the judgment in this case was reversed and the cause was remanded. On March 3, 1925, application for rehearing was made by the state, and on March 17th this application was overruled. On petition to the Supreme Court for certiorari writ was denied on May 28, 1925 (106 So. 617[1]), and an application for rehearing in that court was denied. By reason of certain expressions appearing in the opinion of the Supreme Court, and for the purpose of making clear the opinion heretofore rendered, this court, on June 30, 1925, ordered the cause restored to the rehearing docket for further consideration.

[29] It is rather demanded, or, shall we say, insisted, by the Special Attorney General that the opinion of the Supreme Court rendered on application for rehearing is a mandate or order to this court that all questions save one are to be ignored, and that an affirmance of the judgment be entered. With the greatest respect for the Supreme Court, and with due consideration of the insistence of the Special Attorney General, this court adheres to its prerogative as defined in Postal Tel., etc., Co. v. Minderhout, 195 Ala. 420, 71 So. 91:

"This court (Supreme Court) has repeatedly laid down * * * the rule that it will revise the rulings of the Court of Appeals upon certiorari only as to questions of law, and not upon a finding of facts, or in the application of the facts to the law."

Before the decision in the Minderhout Case there had been much difference of opinion and some uncertainty as to the meaning of the Constitution and statutes regarding the two appellate courts. In that case the system was well considered, clearly expressed, and since then well understood by both bench and bar. This court recognizes and obeys promptly the mandates of the Supreme Court; but, in view of the law as it is, this court cannot construe the expression in the opinion referred to as being an order to this court for an affirmance of the judgment.

The former opinion is amplified and extended, and the application is overruled.

RICE, J., not sitting.