[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 377 
This is an appeal from a judgment of conviction and sentence to life imprisonment for murder, a jury having found defendant guilty of the lesser included offense of murder on a trial under an indictment charging him with the capital crime of intentionally killing Mary Henderson in the course of his robbery or attempted robbery of her "in violation of Section 13A-5-31 (a)(2) of the Code of Alabama." Sections 13A-5-30
through 13A-5-38 were repealed by Acts 1981, No. 81-178, § 20, effective July 1, 1981, which provided, however, at page 203, it "shall not affect the application of pre-existing law to conduct occurring prior to July 1, 1981." The date of the alleged crime was June 10, 1980. The verdict finding the defendant guilty of murder was in accordance with the court's oral instruction that the expressly charged crime included the lesser crime of murder.
None of the numerous witnesses on the trial testified that he or she saw or heard the occurrence that resulted in the death of the alleged victim at her home at 715 Central Street, Montgomery. The first witness who testified in detail as to what was observed inside the home of the alleged victim was Lt. Sidney T. Williams, of the Montgomery Police Department, who said that the dispatcher notified him that there had been an apparent death at 715 Central Street that seemed to require investigation, to which he promptly responded and arrived about the same time as the paramedics at about 8:00 P.M. on June 10, 1980. He testified that when he entered the front door he "noticed an elderly black female lying on her back" who was "tied hand, feet, and also an object tied around her mouth" and was not moving. He further testified:
 "The paramedics were leaning over her, and that's when I saw that there wasn't any signs and there was an apparent death involved. And I asked them to back off and I immediately called back to headquarters to advise them of what we found, and to get investigators en route. And I stood by, more or less, until my first patrol unit arrived on the scene, and advised them to get in certain areas around the house to secure the scene until investigators arrived."
Investigator and Evidence Technician Marty Cochran, of the Montgomery Police Department, testified that she arrived on the scene at approximately "five, ten minutes after eight o'clock" and saw the body *Page 378 
of "Mrs. Henderson," that she stayed at the scene about five hours and took a number of pictures that were introduced in evidence. She said the body of the victim was "tied up and gagged, bound" and remained in that condition for about an hour and a half after the witness arrived at the scene, when the body was then transported "away from her house."
Dr. Richard Roper, as Supervisor of the Montgomery Regional Laboratory of Alabama Department of Forensic Sciences, testified that he performed an autopsy on the body of the alleged victim, which commenced a short time before midnight and lasted about two hours. He determined that the victim had been dead about four hours prior to his examination of her and that "the death occurred as a result of asphyxiation due to binding of the mouth with obstruction of the airways by the tongue."
Vaste Pitts, a close neighbor of the alleged victim, testified she saw on the afternoon of June 10, 1980, an automobile parked next to the victim's house and two men come out of the house and get in the automobile and leave. She soon thereafter took a bath and went to the victim's house and "the next thing I seen was one of her feet. And I just broke out of the house hollering" and her grandson called the police and "plenty of them" came out there. As to the identity of the men, she testified:
 "Q. And let me just back up then. One more thing. These two black men that you saw leaving her house and getting in the car, you said you really didn't get a good look at their faces; is that right?
"A. No, I didn't say anything about that.
"Q. You just don't know?
"A. Uh-huh."
She never identified appellant as either of the two men. Some of her testimony was to the effect that, on the morning of the same day, one or both of the two men had been to her house wanting to spray her house, but she didn't hire them to do so by reason of her not having the money to pay them.
There was considerable testimony to the effect that the defendant and one Willie Phillips were on Central Street and in other areas nearby on the morning and the afternoon of June 10, 1980, and solicited jobs from residents thereof to spray their houses. Both men were arrested the following day. While under arrest, this appellant made and signed the following statement:
 "At about 9:00 A.M. Willie Phillips came over to 161 Yougene Street where I stayed to pick me up. This was yesterday morning. He said that he had a house to spray and that he wanted me to go and help him. The house was in Sheraton Heights. When we got to the house, we found that the lady wasn't at home, and would not be back until about four P.M. I told him that I hadn't eaten, so he took me back home. That was about nine or ten thirty. Then he left and I stayed home and watched T.V. a little bit, and about 4:00 P.M., I walked downtown and went to the Red Bell. I was going to shoot some pool, and there I saw Willie Phillips again. When we got through shooting, I asked him if he would run me home because I had to go to band practice. He took me home in his car and then left, and this was about four thirty or five. After he left, I went around to Robert Hill's house to ask him if he was ready to go to band practice. The drummer for our group, named Larry, was at Robert's house and me and Robert and Larry and my girl friend all went to band practice. . . ."
The statement signed by this appellant included the following questions by an officer and answers by this appellant:
 "Q. Did you go with him [Willie Phillips] to the house on Central Street yesterday afternoon?
"A. No, I didn't.
 "Q. Did you know a Mary Henderson that lives on Central Street?
"A. No, I didn't.
 "Q. What kind of car were you and Willie riding in yesterday afternoon?
"A. A black Buick.
"Q. Who owns the car? *Page 379 
"A. I guess he does.
"Q. Do you help Willie spray houses often?
"A. No, I don't.
"Q. Have you ever helped him before yesterday?
"A. No.
"Q. Do you know where Central Street is?
"A. No, I don't."
According to the testimony of the appellant, about 9:00 A.M. June 10, 1980, Willie Phillips came by the house where appellant was staying and asked appellant to go with him to help him "spray some houses." Willie Phillips told him that he had a house to spray at Sheraton Heights. When they arrived at the house at Sheraton Heights, the lady was not at home and Phillips told him that they would try somewhere else. They went to a large number of places, but "everybody was saying no, they didn't have the money" or that they "didn't want their house sprayed." They did not succeed in going into anyone's houses and spraying them until they came to the house of Mrs. Henderson, who let them in her house. His testimony continues as follows:
 ". . . the lady was sitting in a chair working on that blue fan [a floor fan].
"Q. You talking about this fan right here?
"A. Yes, sir.
"Q. All right.
 "A. She was working on it trying to put the screen on the fan. The screen had come out, and she was trying to put it on. I guess, by her being so old or whatever, she was having a hard time putting the screen on, and so I asked her, I said, hey, do you want me to give you a hand putting it on, and she said yes you can help me. I would sure appreciate it. I put the screen on the fan, and by the time I'm doing this, Willie had already started spraying. When I got through, Willie tells me, hey, man, come on and help me move the sofa out of the way. I helped him move the sofa. He sprays behind the sofa. We do all that, and he sprays the front room completely. We leave the front room.
 "Q. All right. Wait a minute. Now, you of course touched the fan?
"A. Yes, sir.
 "Q. Okay. All right. And then you say, Willie said come and help me move something. What did you all move?
 "A. We moved the sofa. We moved a couple of chairs that was in the living room. The curtains, pulled the curtains back. She had some long curtains."
The defendant further testified as to the shoes that he was wearing while in the victim's house. He said that Mrs. Henderson gave Willie a twenty dollar bill, after he had told her that he charged her fifteen dollars and that when he told her he didn't have the change for the twenty dollar bill, she said for him to keep the five-dollar-difference. Willie never succeeded in getting any more business that day and played pool and lost what money he had to another person while playing pool. He asked Willie to take him where he was staying, that he was tired. Willie took him and left him there at about 4:00 P.M., and thereafter, the witness-defendant went to band practice.
Except for some additional evidence that will be discussed in connection with the issues presented by appellant, we think the foregoing summary of the evidence suffices. We now proceed to consider the issues presented in the order of their consideration in the briefs of the attorneys for the respective parties.
 I.
The position is taken in appellant's brief that he was denied his Sixth Amendment right to a speedy trial as now safeguarded by the due process clause of the Fourteenth Amendment to the Constitution of the United States. In a brief argument on the particular issue, he makes it clear that on the authority ofDillingham v. United States, 423 U.S. 64, 96 S.Ct. 303,46 L.Ed.2d 205 (1975), the defendant herein became the "accused" within the meaning of that word as contained in the *Page 380 
Sixth Amendment on the date of his arrest, June 11, 1980. He also recognizes that in accordance with Barker v. Wingo,407 U.S. 514, 92 S.Ct. 2182, 33 L.Ed.2d 101 (1972), the balancing test is to be applied and that the intervening approximately two years between the date of his arrest and the date of his trial on May 5, 1982, does not per se constitute a denial of his constitutional right. Nevertheless, he insists:
 ". . . However, the delay must not be purposeful or oppressive. Smith v. Hooey, 393 U.S. 374, 89 S.Ct. 575, 21 L.Ed.2d 607 (1969). In the present case, the tactics used by the State involving the two indictments were purposeful and oppressive in that approximately two years elapsed between appellant's arrest on June 11, 1980, and his trial on May 5, 1982. Moreover, the Defendant was incarcerated during the entire period thereby being unable to assist his attorney in his defense."
We agree that incarceration during the entire intervening period is a factor that is to be considered favorably to an accused on the question of his right to a speedy trial, but we do not agree with the conclusion asserted by appellant, without any supporting facts whatever, that the State used tactics involving the two indictments that were purposeful and oppressive.
We are not informed by a record of all that occurred in the proceedings under the first indictment, but we are enlightened by some references thereto in the record of the proceedings in the instant case under the second indictment. We are persuaded thereby, particularly by a plea in abatement as to the second indictment, that the first indictment "embodies the same facts as those embodied in the" second indictment. We are led to believe by the record before us that at one time prior to the return of the second indictment and during the pendency of the first indictment, alleging that his right to a speedy trial had been denied, and therefore a few months after the first indictment, defendant had in writing, with the approval of his counsel, waived his right to a speedy trial, which was not revoked until November 7, 1980. What happened to the first indictment is not clearly shown in the record before us, but apparently it was still pending at the time of the return of the second indictment and continued to be pending until shortly before March 16, 1981, when defendant was arraigned on the second indictment and entered a plea of "not guilty and not guilty by reason of insanity" and the cause was set for trial on July 27, 1981. From all of this it is to be observed that a substantial part of the approximately two-year intervention between the defendant's arrest and his trial is attributable to action by him, with the approval of his attorney, and that not more than about a year and a half of the intervening time is attributable to the State. It is to be further observed that although defendant's attorneys made it known several times that he claimed that he in the past had been denied a speedy trial, he did not at any time make it known that he desired a speedy trial in futuro, that during all of that time he was represented by able counsel, who continued to represent him until after judgment of conviction and sentence and was succeeded by other able counsel who represented him on his motion for a new trial and continues to represent him on appeal. There is no clear explanation of why the case was not tried on July 27, 1981, the date to which it was set on arraignment, but on June 24, 1981, defendant filed a motion for psychiatric examination, which motion was granted the following day. It is reasonable to assume, we think, that this circumstance induced, or at least had some influence upon, the failure to try the case on or soon after the date it had been set for trial, July 27, 1981.
Although it did not surface with clarity in any of the record before us, we are reasonably confident therefrom that some of the passage of time between the timely first indictment and the trial under the second indictment was influenced by the decisions of the Supreme Court, the Alabama Supreme Court, and the Alabama Court of Criminal Appeals in the Beck case, infra, covering a period commencing before the date of the alleged crime in the *Page 381 
instant case and not ending before December 19, 1980. On December 19, 1980, in Beck v. State, Ala. 396 So.2d 645, it was held that, consistent with Beck v. Alabama, 447 U.S. 625,100 S.Ct. 2382, 65 L.Ed.2d 392 (1980), which had reversed the judgment and sentence to death of Beck, which had been previously affirmed in Beck v. State, Ala.Cr.App., 365, So.2d 985 (1978), cert. denied, Ala. 365 So.2d 1006, the then effective Alabama Death Penalty and Life Imprisonment Without Parole Act could be saved from the constitutional infirmity found therein by the Supreme Court by appropriate instructions from the trial court to the jury on each lesser included offense which has any basis in the evidence. The Alabama Supreme Court then remanded the Beck case to the Alabama Court of Criminal Appeals for it to reverse the judgment of the trial court and remand "the cause to the trial court for proceedings not inconsistent with requirements of law as set forth in" the opinion, in which it is also said at 396 So.2d 656, citing Beckv. Alabama, supra:
 "A statute which precludes a judge from instructing a jury on lesser included offenses, even though a lesser included offense is supported by the evidence, is unconstitutional. . . ."
In accordance therewith, the Alabama Court of Criminal Appeals reversed and remanded the Beck case to the trial court. Beck v.State, Ala.Cr.App., 396 So.2d 666 (1981).[1] We are of the opinion that it was in the interest of justice according to law, the guiding star of judicial proceedings, that the trial court, the parties and all others concerned with this case, handled it with commendable caution and circumspection rather than rushing ahead without chart or compass to guide them. According to the rationale as finally determined in Beck,supra, if the case had been tried prior to December 19, 1980, the defendant would possibly have been convicted of the crime expressly charged in the indictment, instead of the lesser included offense, and such judgment would have had to be vacated and defendant tried a second time with little likelihood, if any, that the result would have been more favorable to him than the verdict and judgment upon which this appeal is based.
 II.
There is no merit in the appellant's contention for a reversal that "the cumulative effect of the admissions of photographic exhibits [was] so unnecessarily prejudicial as to deny appellant a fair trial." It is correct, as argued in his brief, that "more than 40 photographic exhibits were entered to show the condition of the deceased and the crime area involved in this case." However, there is nothing to show appellant's conclusion that the photographs "were submitted solely to prejudice the jury against the Defendant under circumstances where the State had very little evidence to connect the Defendant to the crime charged." Although it is not often that as many photographic exhibits are introduced in a case in order to show a scene of a crime and the victim of a crime as were introduced in the instant case, we are persuaded that most, if not all, of them had a desirable and legitimate effect of enabling the judge and the jury to better understand the testimony of the witnesses as to what they observed about the deceased and the crime area after approximately 8:00 on the night of June 10, 1980. Appellant does not particularize any exhibit as subject to a valid objection or specify any ruling of the court as erroneous as to the introduction of such items in evidence. In conformity with the principle that the trial court is afforded "a wide and liberal latitude in the admission of photographs illustrative of a criminal transaction and the surrounding circumstances," we conclude that the photographs were properly admitted in evidence. Lawrence v. State, Ala.Cr.App., 409 So.2d 987, 990 (1982); Arnold v. State, Ala.Cr.App., 348 So.2d 1092 (1977), cert. denied, *Page 382 Ex parte Arnold, Ala., 348 So.2d 1097 (1977); Lewis v. State, Ala.Cr.App., 339 So.2d 1035 (1976), cert. denied, Ala.,339 So.2d 1038 (1976).
 III.
The next issue presented by appellant is thus stated in his brief:
 "WHETHER THE COURT ERRED TO REVERSAL BY OVERRULING APPELLANT'S OBJECTION TO THE TESTIMONY OF ONE RUSSELL McCLOUD CONCERNING THE FACT THAT ONE WILLIE PHILLIPS, AN ALLEGED ACCOMPLICE, POSSESSED FOUR OR FIVE ONE HUNDRED DOLLAR BILLS SOME TIME AFTER THE INCIDENT IN QUESTION."
A target of this contention of appellant is that part of the testimony of Russell McCloud, a cousin of Willie Phillips, who had stated in his testimony that on the afternoon of June 10, 1980, he saw Willie Phillips and the defendant in Willie's car, that he asked each of them if they had any money to buy gas and each replied, "No." He further testified that some time after 7:00 o'clock that evening, the following occurred:
 "Yes, sir. He rolled his window down on the passenger's side. He said, hey, Cuz, you still need some gas money? And I said, yeah. He gave me three one dollar bills.
"Q. What other money did you see at that time?
 "A. He flashed his bankroll, so to speak, four one hundred dollar bills."
Appellant contends, and probably correctly, that such testimony was admitted over his previous objection. He says it constituted inadmissible evidence as held in Dailey v. State,233 Ala. 384, 387, 171 So. 729, wherein the following principle was stated and applied:
 "It is a well-recognized rule that the incriminating acts or statements of one confederate after the ends of the conspiracy have been accomplished, and no longer exist, are not admissible against another in his absence and without his knowledge and consent."
The principle has been applied in a large number of subsequent cases, from which the facts in the instant case are distinguishable in that there was more involved than a mere actor statement of the confederate. Of primary consideration was the fact that Willie Phillips had in his possession four one hundred dollar bills soon after the alleged victim was killed and did not have as much as three dollars before she was killed. Directly in point in favor of the admissibility of the evidence is the following from Gamble, McElroy's AlabamaEvidence, § 195.03 (8): "The state may prove, against the accused, the existence after the crime of a physical fact which tends to show the guilt of his co-conspirator.[2]
 IV.
By the fourth issue presented by appellant, he "contends that the search of the residence of Willie Phillips is irrelevant to this case." One of the officers who participated in the search of the residence of Willie Phillips testified in part:
 "We located a sprayer in the southeast bedroom. Blue jogging shoes under the bed in the southeast bedroom. An army shirt in the kitchen in a clothes basket, and a black pair of men's pants in the kitchen in a clothes basket."
We doubt that the evidence found in Willie Phillips's residence (one that he was occupying with another person) was of any great significance or importance, but the items found tend to corroborate testimony of the State's witnesses as to the activities of Willie Phillips and the defendant on June *Page 383 
10, 1980, and for that purpose, at least, they constituted relevant, competent and material evidence. The contention of appellant to the effect that there was no evidence that appellant and Phillips participated jointly in the slaying of the alleged victim is negated by substantial circumstantial evidence that they were co-conspirators.
By the fourth issue presented by appellant, he contends also that there was "no probable cause for a search of the residence where Terry Ringstaff was living." We do not agree with the quoted conclusion of appellant's attorney, but even if there was no probable cause for searching the house where Terry Ringstaff lived, the negative results thereof were not harmful to appellant. In this connection as well as in connection with some of the other issues raised by appellant, we note that some of the evidence introduced by the State could well have influenced the verdict of the jury acquitting the defendant of the capital crime of intentionally killing the victim in the course of robbery or an attempted robbery. In our opinion, no error prejudicial to defendant was committed by the trial court in any of its rulings pertaining to the admission in evidence of the results of the search of either residence, the defendant's or that of Willie Phillips.
 V.
By the fifth issue presented by appellant, he urges that the trial court was in error in overruling defendant's objection to testimony as to the seizure of four or five one-hundred-dollar bills on the person of Willie Phillips at the time of his arrest. We disagree for the same reason set forth supra, as tersely stated in Gamble, McElroy's Alabama Evidence, supra.
There was substantial, though disputed, evidence that appellant and Phillips were co-conspirators. The possession by Phillips of a sizable amount of money of the kind that Ms. Henderson had previously had in her possession was "a physical fact" tending "to show the guilt" of appellant's "co-conspirator," and was admissible against appellant even though appellant was not present at the time Phillips was searched.
 VI.
This issue pertains to appellant's contention here and on the trial that he should have been allowed to show that in the room where and when Phillips was arrested and as the officers were entering the room to make the arrest, one Eugene Glenn, who had been playing cards with Phillips for high stakes "concealed himself under the bed with a pistol." During the hearing of a motion in limine, it apparently was made clear to the trial judge that the law enforcement authorities had concluded definitely that there was no evidence whatever connecting Eugene Glenn with the death of Ms. Henderson. At the conclusion of the hearing on the motion in limine for the trial court to instruct defendant's attorneys not to bring to the attention of the jury by evidence or otherwise that Eugene Glenn had concealed himself under the bed on said occasion, and after the attorneys had endeavored to support their respective positions by citations of authorities, the following occurred:
 "THE COURT: All these cases have a little age on them.
 "MR. MINDELSON [Assistant District Attorney]: We could update it, I think. These articulate a little bit better, and the fact situations are closer. I know it is cited in some of them. I think even in McElroy, if I'm not mistaken, but we'll be glad to locate them.
"THE COURT: Where is it in McElroy?
"MR. RIGGS [Attorney for Defendant]: 48.01 (3).
 "THE COURT: I think I ought to grant it to get the motion in limine. For the time being, and at a later time I'll be glad to hear you.
 "MR. RIGGS: All right. If I'm going to bring it up, I'll mention it to you.
"THE COURT: All right, gentlemen.
 "(Whereupon, the jury and all parties being present, the trial proceeds as follows, to-wit:)" *Page 384 
The answer to this issue between the parties is to be found in the following two sentences and the authorities cited in the footnotes of Gamble, McElroy's Alabama Evidence, § 48.01 (3):
 "As a general proposition, evidence of the flight or concealment of another person soon after the date of the offense for which the accused is being tried, without more, is not admissible. Where there is additional evidence, however, pointing with strength to such other's guilt, it then becomes permissible for the accused to prove the flight or concealment of such other."
Neither on the trial nor on appeal has it been shown that there was any evidence in addition to concealment that pointed with any strength to Eugene Glenn as a guilty participant in the murder of Ms. Henderson. The trial court was correct in granting the State's motion in limine. As previously indicated, the evidence was undisputed to the effect that even if Eugene Glenn had been a co-conspirator with Willie Phillips in the murder of the alleged victim, such fact would have had no tendency to prove, in all of the circumstances of the instant case, that Terry Ringstaff was not also a co-conspirator.
 VII.
Soon after the defendant in this case was placed under arrest, he was questioned by police officers as to his possible connection with the crime, and in the course of his discussion of the matter with them, he signed a written statement which has been quoted above in its entirety. The statement was admitted in evidence over the objection of the defendant. Appellant now says, as his trial attorneys said on the trial, that the statement was not voluntary and that its admission in evidence was in conflict with Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). Appellant claims that there was "police misconduct" when one of them made a statement to him "that was untrue," the statement being that Willie Phillips had "put it all on you." There is evidence that such statement was made by one of the police officers. However, we cannot say with certainty that the statement was true or untrue, as we do not have before us the complete statement of Willie Phillips. Nevertheless, we are convinced that a reasonable and proper construction of any statement by an officer at the time that Willie Phillips had put it all on defendant requires the conclusion that it was not an intentional misrepresentation of the facts. All of the circumstances prior to the written and oral statements of the defendant, including the explanation to him of all of his constitutional rights, including those set forth in Miranda v.Arizona, supra, ensued before defendant made the statements that were admitted in evidence. Furthermore, it is to be noted that defendant's statements did not constitute a confession. He expressly and categorically denied any participation in the crime for which he was being tried. The statement was introduced in evidence by the State, not as a confession of defendant but, on the contrary, as a false exculpatory statement by him which "is provable without regard to the rules governing the admissibility of confessions." Gamble, McElroy'sAlabama Evidence, § 200.02 (4)(c), wherein supporting authorities are footnoted and cited. The trial court did not err in overruling defendant's objections to his statements to the officers.
 VIII.
Appellant's eighth issue is thus stated in his brief:
 "WHETHER THE TRIAL COURT ERRED IN OVERRULING APPELLANT'S OBJECTION TO THE TESTIMONY AND EVIDENCE OF WILLIE PHILLIPS' FINGERPRINTS AND SHOE PRINTS TAKEN FROM THE LOCATION OF THE INCIDENT."
This issue is to be resolved by considerations heretofore given to other issues presented by appellant, in which we concluded, in accordance with authorities cited, that evidence of physical facts tending to show the guilt of a co-conspirator of defendant is admissible. The trial court was *Page 385 
not in error in overruling defendant's objections to such evidence.
 IX.
Appellant concludes his brief by insisting "that there is no conflict in the evidence concerning his [appellant's] guilt." On the contrary, we are of the opinion that there was a definite conflict between the circumstantial evidence tending to show his guilt and the testimony of defendant and several alibi witnesses which, if true, would conclusively establish his innocence. This prevents our agreeing with the concluding sentence of appellant's argument that the trial court was in error "in failing to grant Appellant's Motion to Exclude the State's evidence in that the conviction was based solely on uncorroborated extrajudicial statements of an alleged accomplice under circumstances where the appellant was not present."
In concluding this opinion adversely to appellant, we think it appropriate to say that we have been most favorably impressed and refreshed by the undisputed evidence of defendant's unspoiled record for law observance prior to the crime involved in the instant case and by the splendid reputation he had among the people who know him. This should serve him in good stead in the future to such extent, we hope, that he will endure his punishment with courage and will ever after measure up to the enviable record he has established, except for this one case, and the good reputation that he has enjoyed. Our best wishes to that end accompany him.
In none of the issues presented by appellant do we find any error prejudicial to him, and there is no error in the record prejudicial to defendant that is obvious to us. The judgment of the trial court should be affirmed.
The foregoing opinion was prepared by Retired Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under the provisions of § 6.10 of the Judicial Article (Constitutional Amendment No. 328); his opinion is hereby adopted as that of the Court.
AFFIRMED.
TYSON and HARRIS, JJ., concur.
BOWEN, P.J., concurs in result only.
SAM TAYLOR, J., recuses himself.
[1] For a thorough recital of citations of reported Ritter cases prior to Feb. 11, 1983, see Ritter v. State, Ala.,429 So.2d 928 (1983).
[2] "Lancaster v. State, 21 Ala. App. 140, 106 So. 609, cert.denied, 214 Ala. 2, 106 So. 617 (1925) (murder charge in which murderers got muddy in committing the crime and the trial court admitted, against the accused, the muddy clothing found in the co-conspirator's possession); Dawkins v. State, 20 Ala. App. 54,100 So. 619 (1924) (stealing hogs; court admitted both that part of the meat found at accused's house and that found at the co-conspirator's house); Jones v. State, 18 Ala. App. 626,93 So. 332 (1922) (charge of distilling and court admitted evidence of `still slop' on co-conspirator's pants soon after the raid.)"