# Martin *v.* The State.

## *Indictment for Murder.*

1. *Arrest without warrant.*—A policeman, or town-marshal, may, without a warrant, arrest any one who commits a breach of the peace in his presence (Code, §§ 4260-62), or who, by boisterous conduct, accompanied by violent words or actions, indicates a present purpose to do so.

2. *Same; summons of bystander to assist, and proof thereof.*—A policeman, or town-marshal, when authorized to make an arrest without a warrant, may summon any bystander to assist him, if deemed necessary; and the summons being made verbally, the words spoken by the officer for that purpose, may be proved, whenever the *factum* of the appointment becomes a material inquiry.

3. *Proof of official character of deceased marshal or policeman.*—As proof of the official character of the deceased at the time he was killed, witnesses may testify that he was acting as town-marshal, that he wore a policeman's badge, and carried a policeman's baton; and it is not necessary to produce any record or written evidence of his appointment.

4. *Conspiracy, and proof thereof; liability for acts and conduct of each other.*—To establish a conspiracy, or common purpose to do an unlawful act, positive testimony is not necessary; nor is it necessary to show pre-arrangement to do the particular wrongful act committed. If two or more persons associate themselves together with intent to commit a breach of the peace, or other wrongful act, each is responsible, criminally as well as civilly, for the acts of the others in the prosecution of their common purpose, or in the commission of an unlawful act incidental to their common purpose, which in the nature of things was probable, though not specifically designed; but not for independent acts outside of the common purpose, growing out of the particular malice of the individual perpetrator.

5. *Acts and declarations constituting part of res gestæ.*—The deceased having been killed while acting as town-marshal, in attempting to arrest the defendant and his brother, at the instance of one J., for an attempted or threatened breach of the peace, in which the defendant had taken J.'s pistol from him; it is competent for the prosecution to prove that, immediately after the fatal shot was fired by the brother of the defendant, J. knocked the latter down, and took the pistol from him; and that the defendant told his brother, with an oath, to "get out of town, you have done the work for him," which the latter refused to do "until he found what J. had against him,"—all this being parts of one continuous transaction.

FROM the Criminal Court of Jefferson.

Tried before the Hon. SAM. E. GREENE.

[Martin v. The State.]

The indictment in this case charged, in a single count, that the defendant, William Martin, killed Owen Kelly, by shooting him with a pistol. The defendant pleaded not guilty, but was convicted of manslaughter in the first degree, and sentenced to the penitentiary for the term of six years. The homicide occurred, as was proved on the trial, at Warrior in said county, in an attempt by the deceased, who was at the time acting as town-marshal, assisted by C. F. Wardrup and D. Jones, to arrest the defendant and his brother, George Martin, for an attempted or threatened breach of the peace. The fatal shot was fired by George Martin, and killed the deceased almost instantly. Several other shots were fired, as the evidence tended to show, one by Kelly, and one by the defendant, neither of which took effect; and there was evidence tending to show that George Martin fired two more shots after killing Kelly. A few minutes before the difficulty, the defendant and his brother George entered a saloon kept by D. Jones, and called for beer; and while there, George Martin knocked the glasses from the counter, and assaulted one Matthews, who was inside of the bar. Jones attempted to interfere, but Will. Martin, the defendant, took his pistol away from him. Jones then left his saloon, and went up the street until he met Kelly, the acting marshal, who, summoning Jones and Wardrup to assist him, went back towards Jones' saloon, and met defendant and his brother coming towards them on the sidewalk, defendant having a pistol in his hands, which he had taken from Jones, and George Martin an open knife, which he had drawn on Matthews. As the parties approached each other, Kelly called to George Martin, "Give me that knife," or, "Drop that knife," and nearly at the same moment he and the defendant each fired his pistol. George immediately reached around his brother, took a pistol out of his right pocket, and fired at Kelly, killing him.

D. Jones, being examined as a witness for the State, was asked, "What did Kelly say and do when you came up to him?" and answered: "He told me I was deputized to assist him in arresting those men." To this question and answer, each, the defendant objected and excepted. Wardrup, another witness for the State, testified: "I first saw Kelly in front of Beck's saloon. He put his hand on my shoulder, and said, 'Wardrup, you are legally authorized to assist me to arrest these two men.' He was acting as marshal of the town, the regular marshal having left a few days before for

[Martin v. The State.]

Kentucky; had an old star on his coat, and a police club."
To the admission of each part of this evidence the defend-
ant objected and excepted.   M. Chamblee, another witness
for the State, testified:   "Just after the shooting, D. Jones
went up to Will. Martin, knocked him down, and took the
pistol away from him."   To the admission of this evidence
the defendant objected and excepted. ˙ W. A. White, the
mayor of the town, thus testified on the part of the State:
"Kelly was acting as marshal, in the absence of the regular
marshal.   He had on no uniform, but had an old star on his
coat, and a police club. ˙  ˙  After the killing, Will. Mar-
tin said to George, 'Get out of town, G—d—it, you have
done the work for him.'   Said he would not leave until he
found what D. Jones had against him."   The court admitted
this evidence, against the objection and exception of the
defendant.

The defendant requested the following charges in writing,
and duly excepted to their refusal: (1.)  "If the evidence
shows to the satisfaction of the jury that the defendant knew
of no purpose of his brother to shoot Kelly, or do any other
unlawful act, then, unless the evidence shows beyond a
reasonable doubt that defendant fired a shot at Kelly, they
must find him not guilty."   (2.)  "If Kelly fired a pistol at
George Martin before any pistol was fired, and that George
Martin then took a pistol out of defendant's pocket without
his consent, then defendant could. not be guilty."

SUMTER LEA, for appellant, argued each of the exceptions
reserved, and cited the following cases: *Martin &Flinn v.
State*, 28 Ala. 71; *Johnson v. State*, 29 Ala. 62; *Blount v.
State*, 49 Ala. 384; *Mitchell v. State*, 60 Ala. 33; *Rogers v.
State*, 62 Ala. 170.

WM. L. MARTIN, Attorney-General, for the State.—The
evidence objected to was clearly admissible as a part of the
*res gestæ.*— *Wesley v. State*, 52 Ala. 181; *Smith v. State*,
52 Ala. 407; *Garrett v. State*, 76 Ala. 18; 1 Greenl. Ev.,
§ 108; *People v. Vernon*, 95 Amer. Dec. 49, note.   That the
charges asked were properly refused, see *Amos v. State*,
83 Ala. 1; *Jordan v. State*, 79 Ala. 9; *Williams v. State*,
81 Ala. 1.   As to the authority of the town-marshal to arrest
without a warrant, for any threatened breach of the peace in
his presence, see Code, §§ 4260-62; *Williams v. State*, 44 Ala.
41; *Hays v. Mitchell*, 69 Ala. 452; *Floyd v. State*, 82 Ala. 16.

STONE, C. J.—It is certainly the law, that a policeman, or town-marshal, may, without warrant, arrest any one who commits a breach of the peace in his presence, or who, by boisterous conduct, accompanied by violent words or actions, indicates a purpose to commit a breach of the peace.—*Hayes v. Mitchell*, 69 Ala. 452, and authorities cited; Code of 1886, § 4262. And such officer may summon to his assistance any bystander, or any number of bystanders, when deemed necessary to effect the arrest, and such summons clothes them with authority to render him all needed assistance. And inasmuch as it requires some word or words spoken by the officer, to effect the summons, such word or words, if they express nothing more, can be given in evidence against any one, whenever the *factum* of such appointment becomes a material inquiry. The Criminal Court did not err in admitting evidence that Kelly summoned assistance to aid him in making the arrest, nor in allowing proof of his words by which he effected the summons. It was the proper mode of making the proof.

A question was raised in the trial court, as to the manner of proving the official character of Kelly, who was the victim of the homicide. White, the mayor, and other witnesses, testified that he was acting marshal of the town, and that he wore a badge, and carried a policeman's baton. There was no error in admitting this evidence, and there was no necessity for producing any record or written evidence of his appointment.—1 Greenl. Ev. §§ 83, 92; 5 Wait Ac. & Def. 3-7; 3 Greenl. Ev. § 483.

The testimony tends to show that the Martin brothers, both being present, commenced the disturbance in the saloon kept by Jones; and that this disturbance led to Jones' absenting himself from his place of business, after his pistol was taken from him by Will Martin, the defendant. The defendant, who testified in his own behalf, gave this account of the origin of the difficulty: "George, my brother, who is now dead, and I, went into Jones' saloon, and ordered beer. When we finished, George saw Matthews in the bar, who had discharged him from the mines, and he raised a difficulty with him, drawing a knife. Dee Jones drew his pistol, and I, thinking he was going to shoot me, took it away from him. He then left the bar." The testimony showed, without conflict, that when Jones left his saloon, he went to another saloon, where Kelly was, and that Kelly summoned Wardrup and Jones to assist him, started in the direction of

[Martin v. The State.]

the Jones saloon, to arrest the two Martins. Several witnesses testified that, when Kelly started to arrest one or both of the Martins, they were coming towards the place where Kelly was, from the direction of the Jones saloon, walking side by side, George Martin having an open knife in his hand, and Will Martin a pistol in his. Some of the witnesses said, that each was waving or swinging his weapon as they approached. Kelly commanded George to surrender his knife—some said he gave this command two or three times—but it was not obeyed. The firing soon commenced. Some of the witnesses said, that Will Martin fired the first pistol-shot at Kelly. He denied this, and said he did not fire. If he fired, it was with Jones' pistol, which he held in his hand. The ball, if fired, took no effect. About the same time, or very soon afterwards, Kelly fired, and his ball took no effect. George Martin then took Will Martin's pistol from his pocket, and fired, killing Kelly. He then fired two other shots, probably at other members of the marshal's party, but without effect. It is not denied that George Martin fired the fatal shot, and that Will's ball, if he fired, did no injury. The question raised was, whether Will Martin was guilty of the homicide as a principal in the second degree.

The conviction was for manslaughter, and in that species of homicide there may be principals in the second degree. *Coleman's Case*, 5 Port. 32; 1 Bish. Cr. Law, § 678.

Conspiracy, or a common purpose to do an unlawful act, need not be shown by positive testimony. Nor need it be shown that there was pre-arrangement to do the specific wrong complained of. When two or more persons enter upon an unlawful enterprise, with a common purpose to aid, assist, advise, encourage each other in whatever may grow out of the enterprise upon which they enter, each is responsible, civilly and criminally, for everything which may consequently and proximately result from such unlawful purpose, whether specifically contemplated or not, and whether actually perpetrated by all, or less than all of the conspirators. And it is not necessary to this equal accountability that positive proof be made of the unlawful common purpose with which the enterprise was entered upon. It may be inferred from the conduct of the participants. "All those who assemble themselves together, with an intent to commit a wrongful act, the execution whereof makes probable in the nature of things a crime not specifically designed, but incidental to that which was the object of the confederacy,

[Martin v. The State.]

are responsible for such incidental crime. . . . . And where persons combine to stand by one another in a breach of the peace, with a general resolution to resist to the death all opposers, and in the execution of their design murder is committed, all of the company are equally principals in the murder."—1 Whart. Cr. Law, § 220. "It should be observed, however, that while the parties are responsible for consequent acts growing out of the general design, they are not for independent acts growing out of the particular malice of individuals."—*Ib.* § 397. And this is the general doctrine on the subject.—*Smith v. State,* 52 Ala. 407; *Jordan v. State,* 79 Ala. 9; *Williams v. State,* 81 Ala. 1; *Amos v. State,* 83 Ala. 1; 1 Bish. Cr. Law, § 649.

As we have shown, there was testimony tending to show that the two Martins were walking side by side, each with a weapon in his hand, and waving it, and that they were, in this attitude, walking towards Kelly, the town-marshal. Whether Will Martin, the defendant, fired a pistol or not, it is not pretended that he offered any resistance when his brother took his pistol from his pocket, and with it killed Kelly. And his remark, immediately after Kelly was shot down, if the testimony be believed, shows that he was neither horrified nor surprised at the result. That George Martin was in a very lawless mood, with very lawless intent, is the testimony of all the witnesses, and Will Martin did not controvert, but confirmed it. The jury were not without testimony from which they could draw the inference that the two Martins had a common purpose to set the law at defiance, and to use whatever force might be necessary to accomplish their object; and that each was ready to assist and encourage the other, if assistance and encouragement should become necessary. Finding this to be so, each was accountable for the act of the other, whether such act was previously intended or not, if it grew naturally and proximately out of the unlawful purpose they had in view.

The two charges asked for defendant, each ignored the inquiry of conspiracy, or community of unlawful purpose, and for that reason, if for no other, they were rightly refused.

We think what took place on that occasion, including what the defendant said after Kelly was shot down, was one continuous transaction, and the court did not err in receiving the evidence that was objected to.—*Smith v. State,* 88 Ala. 73.

The judgment of the Criminal Court is affirmed.