No. 13,789.

HELSER ET AL. *v.* THE PEOPLE.
(68 P. [2d] 543)

Decided March 15, 1937. Rehearing denied June 1, 1937.

Messrs. ALTER & UPTON, Mr. SIDNEY P. GODSMAN, for plaintiffs in error.

Mr. BYRON G. ROGERS, Attorney General, Mr. WALTER F. SHERER, Assistant, Mr. A. G. GERTZ, of counsel, for the people.

*En Banc.*

MR. JUSTICE KNOUS delivered the opinion of the court.

THE indictment upon which this case is based was returned against the plaintiffs in error and others by a grand jury of the second judicial district. The indictment contained three counts intended respectively to charge the defendants with conspiracies to commit: (1) Grand larceny; (2) larceny by bailee; and (3) embezzlement. Upon trial the plaintiffs in error Helser and O'Hanlon were found not guilty on the first count; were both found guilty on the second count, and Helser guilty and O'Hanlon not guilty on the third count. Beginning with the motion to quash, and continuing through the proceedings on error in this court, counsel for these plaintiffs in error, upon every possible occasion by appropriate procedure, have zealously and consistently challenged the sufficiency of the second and third counts of the indictment and seemingly principally rely on these points in presenting their case here. Omitting the formal portions, these counts are as follows:

"Second count. * * * That on the eleventh day of May, in the year of our Lord 1934, The American Life Insurance Company was then and there a corporation doing a life insurance business at and in the City and County of Denver and State aforesaid, and it was then and there the owner of certain moneys of the value of One Hundred Thousand Dollars;

"And that C. W. Helser, N. J. O'Hanlon, A. H. Seebass, also known as A. R. Seebass, Jr., Forrest A. Heath, and E. W. Larson on the said eleventh day of May in

the year of our Lord 1934 at and in the City and County of Denver, in the State of Colorado, did unlawfully, maliciously and feloniously agree, conspire, co-operate and confederate to and with each other that one or more of said persons be elected and become officers and agents, to-wit: President, Vice President, Secretary, Treasurer and Directors of said The American Life Insurance Company, a corporation, and being such officers and agents of said life insurance company certain moneys of the value of One Hundred Thousand Dollars did unlawfully, feloniously and fraudulently conspire and co-operate to convert to their own use at and in the said City and County of Denver and State of Colorado, and so in manner and form aforesaid the said moneys of the value of One Hundred Thousand Dollars, of the moneys and personal property of said The American Life Insurance Company, a corporation, feloniously to steal, take and carry away; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the People of the State of Colorado.''

''Third count. * * * That on the eleventh day of May in the year of our Lord 1934, The American Life Insurance Company was then and there a corporation doing an insurance business at and in the City and County of Denver and State of Colorado;

''And that C. W. Helser, N. J. O'Hanlon, A. R. Seebass, also known as A. R. Seebass, Jr., Forrest A. Heath and E. W. Larson on the said eleventh day of May, in the year of our Lord 1934, at and in said City and County of Denver and State of Colorado aforesaid, unlawfully, maliciously and feloniously did agree, conspire and co-operate that some one or more of their number be elected and become officers and agents to-wit: President, Vice President, Secretary and Treasurer of said The American Life Insurance Company, a corporation, and being such officers and agents of said The American Life Insurance Company, a corporation, One Hundred Thousand Dollars in money, of the value of One Hundred

Thousand Dollars, of the moneys and personal property belonging to and in the possession of said The American Life Insurance Company, a corporation, unlawfully, feloniously and fraudulently to embezzle and convert to their own use; and so in manner and form aforesaid the said moneys and personal property, the said One Hundred Thousand Dollars in money, of the value of One Hundred Thousand Dollars, of the moneys and personal property of the said The American Life Insurance Company, a corporation, feloniously to embezzle, steal, take and carry away; contrary to the form of the statute in such case made and provided, and against the peace and dignity of the People of the State of Colorado.''

Plaintiffs in error admit that the conspiracy is sufficiently alleged in both counts but contend that the object of the conspiracy in each instance is not shown by the indictment to be any crime known to either the common law or the statute, and that these counts are fatally defective in not alleging every element necessary to constitute the objective felony as fully as if the indictment was for the perpetration of the offenses of larceny by bailee and embezzlement. Their contention is largely based upon the case of *Lipschitz v. People,* 25 Colo. 261 (53 Pac. 1111), and particularly the following statement in the opinion, page 265: ''In apt words, the conspiracy is sufficiently alleged; but it is strenuously contended that the object of the conspiracy is not shown to be a crime. Arson is a recognized offense at common law, and under the doctrine of *McNamara v. The People,* 24 Colo. 61 (48 Pac. Rep. 541), it might have been sufficient, and probably would be, had the pleader stated the object of the conspiracy to be to commit the crime of arson by burning the building designated; in other words, by designating the purpose of the conspiracy by its common-law name. See, also, 2 Enc. of Law, 917, *et seq.,* and cases cited. But the pleader did not see fit to do that. He attempted to state the ingredients of the crime. In such a case, the law is that when the purpose of the conspiracy is claimed

to be the commission of a crime, the indictment must contain every element necessary to constitute that offense, as fully as if the indictment was for its perpetration.''

In the Lipschitz case, supra, the questioned part of the indictment charging the objective crime was as follows: ''feloniously, willfully and maliciously did conspire, cooperate and agree together to burn and cause to be burned a certain residence building of the property of Peter Winne, trustee, * * *.''

It will be observed that the indictment alleged the purpose of the conspiracy to be the mere burning of the house of another, which would not be arson at common law or under our statutes, since to constitute the crime the burning must be both willful and malicious. It was very properly held that the indictment in that proceeding was fatally defective in substance in that it failed to aver an unlawful act as the object of the conspiracy which is necessary under our statute. *Conner v. People*, 18 Colo. 373, 33 Pac. 159; *Miller v. People*, 22 Colo. 530, 45 Pac. 408.

Considering the real issue in the Lipschitz case, supra, it would seem the foregoing quoted portion of the opinion is really dictum, but in view of the fact that this case was subsequently cited in *Imboden v. People*, 40 Colo. 142, 160, 90 Pac. 608, as authority for the rule, that: ''Unless the crime which it is alleged the defendants conspired to commit is named, the indictment must contain every element necessary to constitute that offense as fully as if the indictment was for its perpetration,'' we deem it advisable to look further in the matter in order that the law may be settled in this jurisdiction.

The second count, under which both plaintiffs in error were found guilty, had for its avowed purpose, and was so treated before and during the trial, the charging of a conspiracy to commit larceny as bailee. Our statute relating to larceny by bailee (section 6732, C. L. 1921) provides: ''If any bailee, by finding or otherwise of any

money, bank bill, or note, or goods or chattels, shall convert the same to his or her own use with an intent to steal the same, he shall be deemed guilty of larceny in the same manner as if the original taking had been felonious, and on conviction thereof shall be punished accordingly.'' Larceny by bailee is not a common-law offense.

In 5 R. C. L., page 1083, section 29, the rule as to the definiteness required in the averment of a statutory crime as the purpose of a conspiracy, is stated as follows: ''It is generally unnecessary to set out the object of a conspiracy as precisely as in an indictment for the crime itself; but it is sufficient to designate the contemplated crime * * * in the words of the statute if it is a statutory offense. It is not, however, necessary to charge the object in the words of the statute. So long as the allegations of the indictment show that the object is the crime defined by the statute, it is sufficient. The reason that the objective crime may be pleaded in the indictment without particularity is, that the crime of conspiracy does not consist in the accomplishment of the unlawful object, or in doing the acts by means of which the desired end is to be attained, but the essence of the offense is the unlawful combination and agreement for any purpose that is unlawful or criminal.''

Under this statement of the law we believe it unnecessary to charge the object of the conspiracy in the precise words of the statute or with the same degree of particularity as would be required in charging the objective offense in an indictment for that offense alone, and that so long as the allegations of a conspiracy indictment show that the object of the conspiracy is a crime defined by statute it is sufficient. If the foregoing rule qualifies the announcements on this subject in the Lipschitz case, supra, and we are not sure that it does as we shall hereafter point out, that decision can be considered as being modified to the extent herein set out.

Counsel for plaintiffs in error insist that the objective

crime of larceny by bailee is insufficiently averred in two specific particulars: First, because this count does not contain an allegation that the defendants were bailees; and, second, because there is no allegation that the property involved was converted to the use of the defendants *with an intent to steal the same.*

In substance the second count, which is hereinabove set out verbatim, charges that the defendants conspired together to be elected to the principal executive offices of The American Life Insurance Company, a corporation, which was then the owner of a large sum of money and that so having been elected to the offices named "and being such officers and agents of said * * * company certain moneys * * * did unlawfully, feloniously and fraudulently conspire and cooperate to convert to their own use * * * and so in manner and form aforesaid the said moneys * * * feloniously to steal, take and carry away," etc.

The objective conversion is alleged to have been accomplished by virtue of the authority of the defendants as officers, necessarily importing that they thereby had custody and control of the funds; so it seems to us the allegation that the defendants were president, vice president, secretary, treasurer and directors of the company at the time they are charged to have converted the money of the company to their own use as definitely charges a bailment as though it was averred in express terms. Since the statute makes no restriction on the character of the bailment and applies to "any bailee by finding or otherwise," we believe the bailment alleged in the second count is within the terms of the statute.

Neither do we believe that plaintiffs in error's second objection to this count is tenable. We cannot see how the inclusion of the phrase "with an intent to steal the same" would give to the defendants, the court or the jury, any additional information not contained in the charge as drawn, or that the defendants were prejudiced by its omission. The indictment definitely averred a fe-

lonious taking and carrying away as the object of the conspiracy. It appears to us that such allegations of a felonious taking sufficiently implies an intent on the part of the takers to steal, without an allegation of the specific intent.

The supreme court of Kansas in *State v. Combs,* 47 Kan. 136, 27 Pac. 818, 819, an embezzlement case in which the indictment was questioned on the ground that it contained no allegation of intent, well expressed the view we take in the following words: ''It was hardly necessary to allege that the money was embezzled and converted with the intention to embezzle and convert the same. It is difficult to conceive how he could have honestly and innocently embezzled and stolen the money intrusted to him.'' In conformity with the foregoing, and for the further reasons hereinafter stated, we therefore hold that the trial court committed no error in overruling the various motions attacking the sufficiency of the second count of the indictment.

██ ██ The third count of the indictment purported to charge the crime of conspiracy to commit embezzlement. The details of the conspiracy were pleaded in substantially the same manner as in the second count of the indictment. An examination of the third count, hereinabove quoted at length, will disclose that the words ''feloniously to embezzle'' are used twice in charging the intended object of the conspiracy. The words ''to embezzle'' are the technical insignia of the crime of embezzlement. The courts very generally have held that a criminal indictment charging that a person ''embezzled'' money has the same effect as if the word ''embezzlement,'' the statutory name of the crime, had been included in the charge. *In re Grin,* 112 Fed. 790, 187 U. S. 181, 23 Sup. Ct. 98; *Mills v. State,* 53 Nebr. 263, 73 N. W. 761; *Teston v. State,* 50 Fla. 137, 39 So. 787.

It seems, therefore, that the third count of the indictment, for the reasons we have just stated, in effect avers the object of the conspiracy was to feloniously commit

380

the crime of *embezzlement*, thus designating the objective crime by its generic name. This situation did not exist in the second count of the indictment, which was wholly silent with reference to the name of the crime which the conspiracy was alleged to have as its purpose. It is conceded, as we understand it, by plaintiffs in error that if the objective crime charged in a conspiracy indictment is a common-law offense, it may properly be charged by its common-law name. They insist, however, if the objective crime is statutory, it is absolutely essential that the indictment specifically state the ingredients of such crime as fully as in charging the commission of the offense itself. They say "embezzlement" is a statutory crime and therefore the detailed method of pleading suggested must be adopted. In support of this position they again cite the case of *Lipschitz v. People, supra*. The opinion in that case suggests by way of dictum that since arson, the purported object of the crime there, is a recognized offense at common law, it would probably have been sufficient to have designated the purpose of the conspiracy by its common-law name of "arson." We perceive nothing in the opinion, however, to indicate that the same rule does not apply with equal force to the propriety of so charging a statutory crime by its statutory name. That this has been the subsequent construction placed upon the Lipschitz case, supra, by this court is indicated in the opinion in the Imboden case, supra, where it is stated, in effect, that the object of the conspiracy may be properly pleaded by naming the objective crime. This declaration has particular significance in that the objective crime the court referred to was "embezzlement," as in the case at bar. No different treatment is suggested in the case of a statutory crime than in one at common law.

In 12 C. J. 618, we find the general rule in this connection, in support of which the Lipschitz case, supra, is the only Colorado case cited, stated as follows: "The purpose or object of the conspiracy * * * must be ap-

propriately averred by setting forth the particular crime or illegal act agreed on.'' On the same page and in the same volume relative to the particularity required in indictments in conspiracy cases, it is said ''* * * the crime intended to be accomplished by the conspiracy need not be described in the indictment with the accuracy or detail which would be essential in an indictment for the commission of the offense itself, but need only be designated as it is known to the common law or defined by statute.'' And again the only Colorado case cited is that of *Lipschitz v. People, supra*. We believe, therefore, that the Lipschitz case does not establish any distinction between statutory and common-law crimes in the manner of alleging the intended offense to be accomplished by the conspiracy. If it is permissible to charge a common-law objective crime by its generic common-law name, which practically all the authorities concede, it is difficult to understand why the same rule should not apply to a statutory crime, the elements of which are certainly just as well, if not better, known than those of the common-law offense. For example, to hold good an indictment in case of a conspiracy to commit arson merely naming arson, a common-law offense, as the objective crime, and not allow the same latitude in a conspiracy to commit embezzlement, a statutory crime, we believe would subject a court to just criticism for obstructing the administration of justice on hair-splitting technicalities. Since the third count of the indictment in effect charges the intended crime by its statutory name and is, therefore, sufficient, in our opinion, we feel there is no need of discussing in detail whether the statutory ingredients of the crime of embezzlement are sufficiently alleged.

We do desire, however, to state generally that our position is fortified by the case of *Imboden v. People, supra*. In that proceeding the fourth count of the indictment was as follows: ''That on the tenth day of September, in the year of our Lord nineteen hundred and four, the Denver Savings Bank was then and there a corporation, doing

business at and in the City and County of Denver, and State of Colorado; and that Leonard Imboden, James A. Hill, Charles B. Wilfley, E. E. Hull, H. L. Hull, C. C. Roberts, W. T. Camp, D. M. Carey, and A. B. Davis, on said tenth day of September in the year of our Lord nineteen hundred and four, at and in the said City and County of Denver and State of Colorado, aforesaid, unlawfully, maliciously, and feloniously did agree, conspire, and cooperate that some one or more of their number be elected and become officers and agents, to-wit: president and vice-president, of said Denver Savings Bank and being such officers and agents of said bank, one million, seven hundred and twelve thousand, five hundred and eighty-seven dollars and thirteen cents in money, * * * of the moneys and personal property belonging to and in the possession of said bank, unlawfully, feloniously and fraudulently convert to their own use; and so, in manner and form aforesaid, the said moneys and personal property, to-wit: Said one million, seven hundred and twelve thousand, five hundred and eighty-seven dollars and thirteen cents * * * of the moneys and personal property of said The Denver Savings Bank, feloniously to steal, take and carry away;'' etc.

This count was held sufficient to charge conspiracy to commit embezzlement. It will be readily noted that the third count in the case at bar is more informative than the foregoing one in the Imboden case, supra, in that the generic words ''to embezzle'' appear in the indictment we are considering and were not mentioned in the other.

With relation to both the counts under discussion in the case at bar, we again refer to the case of *Lipschitz v. People, supra.* It will be recalled that in charging the objective crime in that case there was nothing whatever in the indictment to show that the purpose of the conspiracy was unlawful. The intended result could have been lawful and the indictment was undoubtedly held insufficient on that premise. In both counts in the indictment before us the alleged object of conspiracy is spe-

cifically designated as being unlawful, felonious and fraudulent. In deciding the Lipschitz case, supra, the then Chief Justice Campbell, who wrote the opinion, indicated that had the simple word "felonious" been included in that portion of the indictment charging the objective crime, the indictment would likely have been sufficient. The foregoing suggestion, which is undoubtedly dictum in that case, is entirely inconsistent with the stricter statement of the rule relied upon by the plaintiffs in error contained in dictum in another part of the opinion. In the Imboden case, supra, the strict statement from the Lipschitz case was incorporated in the opinion, as we have pointed out, yet the fourth count of the indictment describing the objective crime in less detailed form than in the case at bar, was upheld. In view of this it is our conviction that had the indictment in the case at bar been before the court in either of the previous cases mentioned, notwithstanding the dictum of the Lipschitz case, it would have been decided that the objective crimes were sufficiently stated.

 Our statute, section 7062, C. L. 1921, provides: "Every indictment * * * shall be deemed sufficiently technical and correct which states the offense in the terms and language of this code, or so plainly that the nature of the offense may be easily understood by the jury." Section 7103, C. L. 1921, further provides: "* * * and no indictment or information shall be deemed insufficient * * * by any defect which does not tend to prejudice the substantial rights of the defendant on the merits." These provisions of the statute undoubtedly were adopted by the legislature with a view of removing from consideration those technical rules of pleading long the bane of criminal procedure at common law and the occasion of many miscarriages of justice in antiquated times. This court, in accordance with the spirit and intent of these statutes, has consistently upon many occasions refused to reverse criminal convictions for technical defects in the information or indictment

which do not tend to prejudice the substantial rights of the defendants on the merits. As we have indicated, we are unable to perceive how the plaintiffs in error were prejudiced in any particular or manner by the form in which the objective crimes were charged. It appears from the record that the evidence of both sides was introduced upon the theory that the objective crimes charged in these two counts of the indictment were as indicated. The jury was fully instructed in the words of the statute with reference to the elements of the two objective crimes involved and had this definite information before them during their deliberations on the verdict and, of necessity, must have found that all these essential ingredients were established by the evidence in returning its verdict of guilty.

We must, therefore, hold that the second and third counts of the indictment respectively were sufficient to charge the objective crimes of larceny by bailee and embezzlement.

The trial of the case at bar consumed twenty-one days and the record consists of almost 4,000 folios. The exhibits offered and admitted are almost as voluminous as the record itself. Naturally, as would be expected, with such a mass of evidence the record contains innumerable objections on the part of the plaintiffs in error to the admissibility of testimony. The plaintiff in error O'Hanlon assigns 87 errors, and the plaintiff in error Helser assigns 88 errors, of which more than 60 in each case are directed at evidence introduced over their objection. To make clear our position with reference to the admissibility of some of the testimony objected to, it seems necessary to state in a general way the facts adduced at the trial. The evidence of the people discloses a series of transactions in all of which the original defendants, in varying degrees and extents, participated, by virtue of which this group actually gained control of the solvent and prospering The American Life Insurance Company, hereinafter called American Life, in which none of them thitherto had had any interest, by the almost unbelievable

feat of using the funds of the company itself in the purchase of the stock control for their mutual and individual benefit.

Heath, Larson & Company, a firm controlled in 1934 by the defendants Heath and Larson, and of which they and Seebass were the principal officers, and with which O'Hanlon was associated, had been engaged in the bond business in the City and County of Denver for some years. It would appear that prior to 1934 Heath, Larson & Company had enjoyed a profitable business but in that year, on account of various conditions, they were experiencing serious financial difficulties. At this time Heath and Larson had control of the management and stock of The Republic Mutual Insurance Company, which they had incorporated, and of several other corporations, all of which were in more or less rather desperate condition. Pressed by their difficult financial situation Heath and Larson made some effort to place another quiescent life insurance company so controlled by them, in a position to sell its stock to the public. It was in connection with this projected activity which required securing a capital deposit of $100,000 to meet the requirements of the state insurance department that the plaintiff in error Helser came into the picture. Helser was represented as being an experienced insurance man and apparently had a very intimate knowledge of the workings of insurance companies and of the insurance business. He appears to have been without any definite business connection and was in straitened financial circumstances. At the suggestion of Heath, Helser moved into the Heath-Larson offices and from time to time, until the control of the American Life was secured, received small advances for living expenses. The plan to develop some activity in the Heath-Larson controlled insurance company was abandoned when Helser suggested that the controlling stock interest in the American Life was for sale and the purchase of its stock would be an easy method of getting into the life insurance business.

Mr. James C. Burger of Denver was then president of

the American Life and, with his associates, owned 86,490 shares of its 100,000 shares of stock. Through a Mr. Bishop, Heath acquired the right to purchase what was referred to in the trial as the "Burger" stock, for $2.50 per share, making the total amount of money required to purchase this stock $216,225. At this time the American Life was the owner of a large amount of legitimate securities and had in its checking account in the Denver National Bank about $230,000. As has been indicated, neither Heath, Larson, Seebass nor Helser had sufficient funds of their own to even attempt a financial transaction of this magnitude. About this time the plaintiff in error O'Hanlon, who had been away from Denver since the middle of March, 1934, returned to the city and this group began a series of conferences and manipulations which led to the criminal transactions charged in the indictment.

The defendants first considered a plan whereby Heath, Larson & Company would borrow securities belonging to wealthy clients which, with some stocks and bonds the firm owned, would be used as collateral at a bank to secure the money necessary to purchase the "Burger" stock. They made two attempts to raise money in this way but the banks declined to make the loans because the securities were borrowed from the Heath, Larson & Company clients. Some unsuccessful negotiations were then had with the owners of the Guardian Trust Building in Denver whereby Heath, Larson & Company would acquire the equity in this building in exchange for their preferred stock and use the equity to purchase the American Life stock. These plans mentioned, having come to naught, the defendants then adroitly conceived the scheme by which the "Burger" stock was acquired. The plaintiff in error Helser, it would seem, was the originator of this plan, which was actually carried out and participated in by all of the defendants, the essential factors of which we now mention.

O'Hanlon prevailed upon a friend of his to secure a certified check for $215,000 to be used for the actual pur-

chase of the ''Burger'' stock. As soon as the defendants had thus secured control of the American Life, they were to elect themselves directors and principal officers of the company as alleged in the indictment, and as such officers and directors would authorize the purchase from Heath, Larson & Company of some $118,000 of securities which this firm owned or had borrowed from their clients, which, however, did not in reality have that market value, and, in addition, $100,000 of certificates of indebtedness of The Republic Mutual Insurance Company—which company is hereinafter referred to as Republic Mutual—were to be issued for this sole purpose, this concern, as has been mentioned, being a corporation entirely controlled by Heath, Larson & Company, which certificates of indebtedness had no value except as would be imported to them by the proposed collateral deposit of 40,000 of the 86,490 shares of American Life stock acquired in the deal. The defendants, as officers of the American Life, having authorized the purchase of these securities, a check was thereupon to be issued by the American Life to Heath, Larson & Company for the full amount of the transaction, in the approximate amount of $218,000. Heath, Larson & Company then was to issue its check to the friend of O'Hanlon's who had loaned the original certified check to consummate the deal, for its amount plus an additional $1,000 for the cost of the certified check, and $20,000 to be later paid for the friend's service in securing and permitting the use of the certified check in this manner. On May 11, 1934, this plan was consummated as outlined with the aid of another check for $1,250 provided by the mother of Seebass. As a result of this transaction, within a few minutes after the election of the defendants as directors of the American Life, Heath, Larson & Company had to its account in excess of $218,000, ($216,000 of which was paid to O'Hanlon's friend for the certified check mentioned), and the bank account of the American Life was depreciated to the extent of this withdrawal, while its security portfolio was only aug-

mented to the extent of the debatable worth of the securities sold to it by Heath, Larson & Company, and, in effect, 40,000 shares of its own stock deposited as collateral to the otherwise valueless Republic Mutual certificates of indebtedness. At this moment, Heath, Larson & Company, or the five defendants—on which point there is a dispute among them—were, in addition, the owners of 46,490 of the shares of the American Life. The next day the defendants assembled again in a board meeting and fixed the salaries of Heath as president and Helser as vice-president at $500 per month; Larson as a second vice-president was to receive $50 per month; O'Hanlon as treasurer, $200 a month, and Seebass as secretary, $300 per month. Between the 12th of May and the latter part of the month the defendants, as the board of directors of the American Life, bought from the Republic Mutual $20,000 additional of its certificates of indebtedness, the check going to Heath, Larson & Company, 8,000 shares of the American Life being deposited as collateral.

In the latter part of May the state insurance commissioner having learned of the transaction by which the stock of the American Life had been secured, made a cursory examination of the situation and notified the defendants that the certificates of indebtedness of the Republic Mutual could not be carried as assets of the American Life.

Faced with this ultimatum the subsequent history of the activities of the defendants is one of frantic and ineffectual efforts to replace or retire the Republic Mutual certificates in the portfolio of the American Life with acceptable securities or money. To add to the further confusion on about June 1 Heath and Larson resigned as officers and directors of the American Life, their resignations apparently growing out of the controversy between the parties with reference to the disposition to be made of the unpledged stock of the American Life secured from Burger. At this time an indefinite arrangement was made by which Heath and Larson were to deliver this unpledged stock to the other defendants in

consideration of a $50,000 note executed by them. To postpone the inevitable day of reckoning founded on the inherent weakness of the Republic Mutual certificates, the Denver General Agency Company, hereinafter called the Agency Company, which purported to be a wholly owned subsidiary of the American Life, was formed to acquire the stock of the American Life, including that pledged to the Republic Mutual and in the hands of Heath, Larson & Company, for sale to the public. The articles of the Agency Company were signed by three dummy incorporators, to each of whom was issued a qualifying share. The board of directors of the American Life, which now consisted of the plaintiffs in error and Seebass, as soon as the Agency Company was formed, authorized the purchase by the American Life of $20,400 worth of the stock of the Agency Company and this concern, through its dummy board, forthwith gave its note to the American Life for $121,000, being the amount of the certificates of indebtedness, with interest, of the Republic Mutual held by the American Life, thereby taking these certificates from the portfolio of that company and at the same time releasing and turning over to the Agency Company the 48,000 shares of stock of the American Life hitherto held as collateral to the certificates of indebtedness. On the same day one of the original incorporators and directors of the Agency Company resigned and Helser was elected a director and president of this company and thereafter, according to the evidence, directly controlled and managed it.

During the entire period following the acquisition of the control of the American Life, an exchange of questionable for good securities between Heath and Larson and the American Life, the sale of worthless stocks and bonds by the former to the latter, and a series of check-kiting transactions between Heath, Larson & Company and the Agency Company, continually transpired. Also during this time the plaintiffs in error, in some cases by subterfuge and device, borrowed money from the Ameri-

can Life or the Agency Company to their personal benefit. These transactions are too involved in detail to attempt to set out in this opinion. The net result of these operations, in which all of the defendants participated or approved, was to cause in varying degrees, directly or indirectly, impairment of the cash and stock resources of the American Life. Late in the year 1934 it developed that certain purported water bonds of the Palisade Water Works Extension of Colorado, which had been sold to the American Life by Heath, Larson & Company, had been forged by Heath and Larson and, according to their testimony, at the suggestion of O'Hanlon and with the knowledge of Helser. Investigation by the authorities of this forged bond transaction brought about the submission to the grand jury of the tangled affairs of the defendants and of the companies controlled by them and the indictment in the case at bar resulted.

As counsel for the plaintiffs in error state in their brief, it would be practically impossible to consider individually the hundreds of specific objections made to the evidence, generally on the ground that it was irrelevant, incompetent and immaterial, and they well adopted the procedure of grouping these objections into various classes which we shall discuss on that basis.

As is indicated in our brief statement of the facts, a considerable amount of evidence was introduced with relation to the insolvent condition of Heath and Larson and of Heath, Larson & Company and of Helser previous to the acquisition of the control of the American Life, including some concerning advances made by the firm to Helser for living expenses during this period. This evidence tends to show that at the time the conspiracy was conceived, some of the defendants were greatly in need of money, which situation would have a definite bearing upon their intent, purpose and design, and was admissible. *People v. Darr,* 262 Ill. 202, 104 N. E. 389. Certain other evidence was received over the objection of the plaintiffs in error with reference to the

financial condition of a number of subsidiary corporations owned and controlled by Heath, Larson & Company. To the extent this evidence bore on the financial condition of the defendants Heath and Larson and their immediate need for financial succor, it would be admissible under the rule we have just stated. Such of this evidence as has a bearing upon the value of any of the stocks or bonds of these companies which were sold or traded, directly or indirectly, to the American Life, we believe would be admissible as showing the intent of the defendants and the ultimate fact of conversion, and this is particularly true in the case at bar where it is practically conceded that all of the defendants during all times covered by the testimony were familiar, in a general way at least, with the involved financial condition of Heath, Larson & Company and of these subsidiary concerns. This general condition of insolvency and the desperate financial need of several of the defendants, at least, undoubtedly had a direct relation to the intricate maneuvers by which they sought to extricate themselves from disaster and all play a part in the culmination of the conspiracy and conversion of which they were found guilty of committing. Likewise, we believe that the evidence relating to the transactions of Heath, Larson & Company with the Agency Company and the details of the Agency Company's organization and dealings, was clearly admissible as tending to prove the ultimate facts in issue and as showing the intent of the conspiracy. Such of these acts as were subsequent to the time the defendants gained control of the American Life manifestly discloses in their performance the original intentions and plan of operation of the defendants. The law relating to the admissibility of evidence of the character we have just discussed is concisely stated in 12 Corpus Juris, page 637, section 230, where it is said: ''Where the guilt of a party depends on the intent, purpose, or design with which an act is done, or on his guilty knowledge thereof, collateral facts in which he bore a principal part may be examined into

for the purpose of establishing such guilty intent, design, purpose, or knowledge. It is sufficient that such collateral facts have some connection with each other as a part of the same plan or as induced by the same motive, and it is immaterial that they show the commission of other crimes.''

The fact that some of the overt acts offered in the evidence at the trial were not contemplated in the original plan of the conspiracy and were not necessary for its accomplishment would not render inadmissible such evidence, as it tends, directly or indirectly, to demonstrate the accomplishment of the common purpose. *Martin v. State,* 89 Ala. 115, 8 So. 23, 18 Am. S. R. 91.

██ It is possible and very likely that many questions were propounded and answers given during the course of the trial which were technically improper, but considering the extent of the testimony and the length of the trial the admitted evidence was generally well limited to the issues involved. Experience has taught that in conspiracy cases an unusual latitude must be permitted in the admission of evidence and this rule is almost universal. As was well said by the court in the case of *Rigsby v. State,* 152 Ala. 9, 14 (44 So. 608): ''The proof of a conspiracy oftentimes, from the very nature of things, is dependent upon circumstantial evidence, and in the establishment of the conspiracy by circumstantial evidence a wide latitude sometimes becomes necessary in the introduction of the evidence as to the circumstances tending to show a conspiracy; circumstances which, when taken separately, may appear, indeed, very slight, but, when grouped together, become very strong and convincing. A circumstance, when taken separately, may seem irrelevant; but, when taken in connection with some other circumstance, its relevancy becomes apparent.''

██ During the course of trial the plaintiffs in error offered in evidence the annual report of the American Life for the calendar year 1934 for the purpose of showing what they contended to be the financial condition

of the company. The admission of this exhibit was objected to by the district attorney on the ground that it was prepared and filed with the State Insurance Commissioner after the returning of the indictment and was, therefore, a voluntary and self-serving statement and the exhibit was excluded on this ground. The trial court committed no error in refusing to admit this exhibit. *Commonwealth v. Cotter,* 55 Pa. Sup. Ct. 554.

We have carefully examined the instructions given the jury. We believe they fairly and correctly cover the law applicable to the case. It would undoubtedly have been proper for the court to have given a separate instruction limiting the evidence relating to collateral transactions to the purpose of intent but no such instruction was definitely requested by plaintiffs in error. Their tendered instruction No. 9 clearly relates to testimony concerning the plan and design of collateral transactions as would be proper in a case where the people contended the defendants had perpetrated other conspiracies by a certain plan and system and introduced evidence of these separate transactions, which was not the situation nor question involved here. Plaintiffs in error tendered instructions Nos. 2 and 7, which had the effect of practically taking away from the jury's consideration a great many of the transactions upon which evidence was received, and they were properly refused. The court's instruction No. 11 informs the jury that the defendants "cannot be tried for or convicted of any offense not charged in the indictment," which, in effect, if not as fully as might be desired, covers the point under consideration.

We have given diligent consideration to the other numerous assignment of errors, and do not believe that the plaintiffs in error were prejudiced in any way by any of the rulings of the trial court involved. They had the benefit of unusually talented and painstaking counsel and their rights were thoroughly safeguarded at all stages of the proceedings. It is our conviction that they were unquestionably guilty of the offenses charged in the in-

dictment and that another trial of this cause would result in similar verdicts. As we have indicated, we find no error in the record and the judgment of the district court is affirmed.

Upon consideration of the petition for rehearing Mr. Justice Young thinks the rehearing should be granted as to count two of the indictment.

Mr. Justice Hilliard and Mr. Justice Holland dissent.

Mr. Justice Holland dissenting.

The effect of the majority opinion is to overrule the case of *Lipschitz v. People,* 25 Colo. 261, 53 Pac. 1111. On the questions here involved, there is such a conflict between the opinion here and the one in the Lipschitz case above cited, that both cannot stand as to these questions; one opinion or the other is correct, both cannot be. If the present pronouncement is to become the law, it should therein state that the former opinion is overruled. The purpose of opinions of this court is to determine litigation before it, and chart the future course for the determination of similar issues.

The majority opinion says "the indictment contained three counts *intended* respectively to charge * * *, conspiracies to commit, grand larceny, larceny by bailee, and embezzlement." It might have been so intended, but the information does not so charge. Indictments should not have to be nourished on the manna of *good intentions,* but should come into being, supported by specific elements which will sustain. The accused, presumably innocent at the outset, is entitled, as a constitutional right, to be confronted with a statement of facts making up the charge. It is from such a statement alone, that the court can determine whether the facts as stated, if established, are sufficient in law to sustain a conviction. If facts are supplanted by conclusions of the pleader, and the request of accused for a bill of particulars, as here, is denied and he is forced to submit to trial unadvised of the nature of

the accusation, the dilemma of an innocent man, as he then stands, is apparent as well as tragic.

Defendants were acquitted on the first count, which supposedly charged a conspiracy to commit grand larceny of the one hundred thousand dollars. The same money, and same transactions were involved in the second count, and on this count, intendedly charging a conspiracy to commit larceny as bailee, both were convicted. Note that they were absolved of larceny and in the same proceeding convicted. Larceny is just larceny, in whatever count it is to be found, and is made up of the same elements at all times and places. If there has to be a perversion of this salutary rule to make it fit the case at bar, so that accused may be found guilty of larceny as bailee, he first had to become a bailee, and *who* is this mythical bailee, now alluded to? Where did he come from? And how did he become bailee? Was the money, affirmatively alleged to belong to and be in the possession of the insurance company, ever shown to be the subject matter of a bailment? For the answer, search the indictment. The search will prove futile. But if the accused must be a bailee in order to sustain a conviction, it has to be *assumed* that he was a bailee, and that apparently was done at the trial, and here, if the majority opinion is to stand. For good measure, it appears that it further was assumed that all this was "with intent to steal," for those words, so necessary, and so easy to use, were overlooked by the pleader. If this now is to be the law, then we are entering a deplorable era, when men *may be assumed* into the meshes of criminal prosecutions, and perchance the penitentiary. Answer me this, does the second count of the indictment, in any wise show a delivery of the money by the insurance company to accused, to be held by him according to the purpose for which it was delivered, then to be returned after that purpose was accomplished? The answer must be *no,* yet instruction No. 7, given by the court so defined a bailment. There must be a bailor and a bailee to constitute a bailment, but here

we have an assumed one without either, notwithstanding which two men are convicted as bailees in a bailment that just did not exist, if the indictment is to be construed as written. A conspiracy is charged, but it is not a crime to conspire, unless it is to commit either a common-law, or a statutory named crime. If not so designated in the charge, then all the necessary ingredients of the crime must be made to appear. Neither are here present, and therefore the motion to quash on these points alone, should have been sustained.

I now consider the third count, which is equally, if not more vulnerable and insufficient. The pleader, probably in doubt as to whether an *assumed* bailee could survive, must have thought, in his confusion, that it could be *assumed* that the accused was a banker, or an officer or servant of the bank, because, to such, his pleading would nearly apply, if the money had been alleged to have been in accused's possession. But not so. He alleged it to be property "belonging to and in possession of said * * * insurance company." Let us consider the provisions of our embezzlement statute, section 6734, C. L. 1921, pertinent parts of which are:

"Embezzlement—What constitutes. * * * If any officer, agent, clerk or servant of any incorporated company * * * embezzles or fraudulently converts to his own use * * * without the consent of his company, * * * any money * * * which has come into his possession or under his care in any manner whatsoever, he shall be deemed guilty of larceny and punished accordingly; * * *.

"If any banker * * * his servant or agent, or any officer, agent or servant of any bank * * * fraudulently converts to his own use * * * with intent so to do * * * money * * * belonging to and in the possession of such bank * * * shall, whether intrusted with the custody thereof or not, be deemed guilty of larceny * * *."

Does it require a critical analysis of this statute to

determine what the necessary elements of embezzlement by an officer, agent, clerk or servant of an incorporated company, must be; namely, that it is of money or other property that has come *into his possession,* or under his care, and which must be converted *without* the *consent* of *his company?* Are such necessary statutory elements alleged in the third count of the indictment? For answer, search the indictment. Where was the money? Not in the possession or care of accused, according to the allegations of this count of the indictment, but unquestionably in the possession of the insurance company, and there is a noticeable silence as to the lack of consent on the part of the company. These missing elements were called to the attention of the trial court by various motions without avail, yet by instruction No. 8, it correctly defined embezzlement and included these elements. Can it be the law, that an indictment need be only a symposium of generalities from which any crime or set of facts may be assumed? I cannot so believe.

In conclusion, how about the status of Helser? He was acquitted and convicted of conspiracy to commit larceny, and then by a verdict on the third count, there is a finding that he, in the same transaction, and under identical circumstances did not steal the money at all, as theft is defined by the larceny statute, but instead he embezzled it, when it never had become the subject of embezzlement because not coming into his possession.

I am not here concerned about the guilt or innocence of the accused, but I am gravely concerned as to how men are to be tried, be they guilty or innocent, and as to their right to a fair trial, if the pronouncement of the majority is permitted to stand, when the way is open for such under sufficient indictments drawn according to approved forms of long standing. Plainly stated, there is no just excuse for the otherwise possible prejudice to the rights of accused.

Mr. Justice Hilliard concurs in this opinion.